STATE OF NEW JERSEY, PROSECUTOR, v. STATE BOARD OF TAX APPEALS ET AL., RESPONDENTS.

CITY OF JERSEY CITY, PROSECUTOR, v. STATE BOARD OF TAX APPEALS ET AL., RESPONDENTS.

SHELTON PITNEY AND WALTER P. GARDNER, TRUSTEES, ETC., PROSECUTORS, v. STATE BOARD OF TAX APPEALS, RESPONDENT.

Argued January 19, 1944—Decided January 31, 1946.

Before Justices PARKER, HEHER and PERSKIE.

For the State, *David T. Wilentz,* Attorney-General of New Jersey (*Milton B. Conford, Harry A. Walsh* and *John Solan,* of counsel).

For the trustees (Shelton Pitney and Walter P. Gardner) of the Central Railroad Company of New Jersey, *Autenreith & Wortendyke* (*William F. Hanlon* and *Joseph F. Autenreith,* of counsel).

For Jersey City, *Charles A. Rooney, Joseph C. Glavin, John F. Lynch, Jr.,* and *Charles Hershenstein.*

The opinion of the court was delivered by

PERSKIE, J. This is a railroad tax case. *R. S.* 54:29A–1, *et seq.* The consolidated writs present for review the attacks made by prosecutors, Central Railroad Company of New Jersey, City of Jersey City and the Attorney-General, for the state (each is hereafter respectively referred to as Central, Jersey City and Attorney-General) upon the judgment of the State Board of Tax Appeals on their respective appeals from the property and franchise valuations and assessments made, after review by the State Tax Commissioner (hereafter referred to as Commissioner), against Central for the tax year of 1942.

The judgment of the State Board wrought the following results:

It reduced the valuations and assessments of $22,446,300 on class II lands in Jersey City, to $14,987,593, a reduction of $7,458,707.

It reduced the $2,338,293 of valuation and assessment on main stem lands (class I) in Hudson County to $1,540,413, a reduction of $797,880; but it did not, however, disturb the valuations and assessments of $7,801,495 on structures.

It affirmed the franchise tax assessments of $1,130,235.51 as finally fixed by the Commissioner. More about this later.

It reduced the valuations and assessments of $124,485 of overhead bridges (class II property) by $111,251.

It sustained the inclusion of valuations and assessments in the elimination of the Somerville, Perth Amboy and Cranford grade crossings.

It canceled and set aside, on the concession of the Commissioner that its inclusion was improper, the assessment and valuation to the extent of $248,666 on account of bridges and culverts—grade crossings on the Elizabethport and Perth Amboy branch of Central's property.

It dismissed the appeals of Jersey City and otherwise confirmed, in all other respects, the valuations and assessments fixed by the Commissioner against Central's property and franchise taxes. See *In re Pitney*, 20 *N. J. Mis. R.* 448; 28 *Atl. Rep. (2d)* 660.

A clear understanding of the several attacks requires at least a broad statement of the grounds upon which each attack is made.

Central, on the record as submitted, assailed the legality of the franchise tax as assessed under *R. S.* 54.29A–13, *et seq.* (Railroad Tax Law of 1941), and the legality of the assessment of grade crossings under *R. S.* 54:29A–7 and *R. S.* 54:29A–10.

In computing the franchise tax due by Central's system, the Commissioner included the revenue which Central derived from the operation of its leased lines (known as L. & S. Division) in the State of Pennsylvania under the "net railway operating income" of its system in our state, for the year ending December 31st, 1941. Line No. 4, *Exhibit CR-4.*

The Commissioner's computation was attacked upon several grounds. They were (a) that, on the proofs, the revenue derived from its operation of the L. & S. Division in Pennsylvania should have been excluded because "separate operating accounts" were maintained for said Division; (b) that the contrary result reached by the Commissioner, and affirmed by the State Board, erroneously expanded the franchise base with the resultant tax of $1,130,235.51 against it rather than the minimum tax of $4,000 (*R. S.* 54:29A–15) which, it was urged, should have been assessed against it, and (c) that such computation was the result of an erroneous construction of the provisions of the statute because it taxed property and

income in the State of Pennsylvania in violation of the due process clause of the Fourteenth Amendment, and of the commerce clause (article 1, section 8), of the United States Constitution.

Central additionally attacked the computation on the ground that even if the inclusion of the revenue derived from the operation of its leased L. & S. Division were proper, nonetheless the tax assessed is excessive because no deduction was made for the rentals which it paid ($2,346,128) as part of its operating costs for the "use and occupation" of such lines in Pennsylvania.

Jersey City assails the dismissal, by the State Board, of its appeals by which it sought an increase in the valuations of class II property from $22,446,300 to $26,486,334 and in the valuation of structures from $7,801,495 to $10,337,900.01, and it further assails the failure of the State Board to determine its asserted claim for re-classification of certain lands from class I to class II property.

The Attorney-General (R. S. 54:29A–33) assails the judgment of the State Board to the extent that it reduced the valuations of class II and main stem property and eliminated the valuation of overhead bridges. In these respects, the State seeks a restoration of the valuations and assessments as made by the Commissioner. Otherwise, the state resists the assaults of Central and Jersey City, and defends the disposition made of them by the State Board.

The record in this case is voluminous. It consists of nine volumes. These volumes contain a mass of expert testimony and over 190 exhibits many of which are of a highly technical and statistical nature. The briefs too are voluminous; they total in all over 565 pages. In addition to argument, they contain in all hundreds of judicial and statutory references. Our careful study of the record, oral arguments and briefs leads us, save as otherwise indicated, to the same results as those urged for the state.

We are met at the threshold of our determination of this case by the contentions of the Attorney-General and Jersey City that the "judgment of the State Board is a nullity" because it is not the judgment of the State Board but of one

man, its president, who alone sat and took the testimony. A detailed statement of the facts which give rise to the stated contention is set down in the majority opinion in the case of *Pitney* v. *Kelly*, 21 *N. J. Mis. R.* 405, 419, *et seq.;* 34 *Atl. Rep.* (2d) 547.

It is urged that the provisions of *R. S.* 54:2–18 and *R. S.* 54:3–20.1 requiring the one member who takes the testimony "to report thereon to the Board" and that "no determination shall be made thereon except by the Board," were not satisfied. In other words, the contention is that the basic requirement of "fair play" which underlies the quoted provisions of the statute is lacking. *Morgan* v. *United States*, 298 *U. S.* 468; 80 *L. Ed.* 1288. *Cf. Redcay* v. *State Board of Education*, 128 *N. J. L.* 281; 25 *Atl. Rep.* (2d) 632; *Jersey City* v. *Hudson County Board of Taxation*, 130 *N. J. L.* 309; 32 *Atl. Rep.* (2d) 594.

There is no need, in our opinion, to pass upon the question. For it is our duty to make an independent finding of the facts and law totally apart from the finding made by the State Board. Since the entry of the judgment by the State Board, the Attorney-General and Jersey City, pursuant to order based upon the statute (*R. S.* 2:81–8) and pursuant to decisions of this court (*Hoboken* v. *State Board of Tax Appeals*, 127 *N. J. L.* 179; 21 *Atl. Rep.* (2d) 34; *affirmed*, 128 *N. J. L.* 321; 24 *Atl. Rep.* (2d) 849; *Lawrence Township* v. *State Board of Tax Appeals*, 124 *N. J. L.* 465; 12 *Atl. Rep.* (2d) 244) have taken and submitted additional testimony. Thus the record before us is complete and no useful purpose would be served in remitting it to the State Board for a finding by that body.

Subsequent to the submission of the record as aforestated, Central concluded to withdraw its appeal from the franchise tax assessment for the year of 1942 and to abandon the reasons filed therefor under the writ of *certiorari* issued in these proceedings and the points and arguments with respect thereto contained in its briefs. Accordingly, an order, consented to for the Attorney-General, was signed on December 27th, 1945, dismissing Central's appeal from the judgment of the State Board in so far as it relates to the franchise tax

assessments for the year of 1942, and the reasons filed for the review. Incidentally, orders were also signed on December 27th, 1945, dismissing Central's writs for the review of the franchise tax assessments for the year of 1943 and 1944. Thus Central's attack now is limited to the legality of the assessments of grade crossings.

In determining the merits our course is well charted. We make an independent determination of the disputed questions of "fact as well as of law" and we "reverse in whole or in part," the tax assessment brought up for review. *R. S.* 2:81-8, *R. S.* 54:4-62. But we do not reverse in the absence of "palpable error," (*United New Jersey, &c., Co.* v. *State Board,* 103 *N. J. L.* 33, 35; 134 *Atl. Rep.* 669), or otherwise stated, unless the evidence is persuasive that the determination under review is erroneous. *Hoboken* v. *State Board of Tax Appeals, supra* (at *p.* 181); *Gannon* v. *State Board of Tax Appeals,* 123 *N. J. L.* 450, 451, 452; 9 *Atl. Rep.* (*2d*) 531; *Lawrence Township* v. *State Board of Tax Appeals, supra* (at *p.* 467).

We proceed to our consideration and determination of the cause on the merits.

### *Assessment of Class II Lands, Terminal Area, Jersey City.*

We recently have held that the "railroad tax law of 1941" is, on its face, free from constitutional restraint as to future taxation. *Jersey City* v. *State Board of Tax Appeals,* 133 *N. J. L.* 202; 43 *Atl. Rep.* (*2d*) 799. Pursuant to that law, the Commissioner fixed a value of $22,446,300 on class II lands, consisting of twenty-three parcels, which are located at Central's terminal area in Jersey City and which lands constitute an integral part of Central's entire railroad system. On appeal, the State Board fixed the value at $14,987,593, a reduction of $7,458,707, or about one-third of the amount assessed by the Commissioner. *In re Pitney,* 20 *N. J. Mis. R.* 448; 28 *Atl. Rep.* (*2d*) 660. For the weight, if any, thereafter given by the State Board to the holding in the cited case, see *Pitney* v. *Kelly,* 21 *N. J. Mis. R.* 405, 408, *et seq.;* 34 *Atl. Rep.* (*2d*) 547.

Did the "railroad tax law of 1941" in anywise change the prevailing method continuously employed by the Commissioner and his predecessors in office since 1884 in assessing the true value (article IV, paragraph 12 of State Constitution) of railroad property for taxation. Our answer is in the negative.

The Joint Legislative Committee, constituted by Senate Concurrent Resolution No. 8, 1941, made two reports to the legislature. The first was made to the 165th legislature. *Exhibit S-9.* Broadly and briefly stated, this report discloses that the Committee heard and considered the views and recommendations of all in interest, including the railroads, on proposed legislation relating to the railroad tax problem. The Committee reviewed and compared the tax burdens on railroad property under the then existing law with those under the proposed law and made like comparisons with the resultant financial effect on all the parties in interest. As a result of its recommendations, the legislature enacted what is characterized as the Settlement Acts (chapter 290, *Pamph. L.* 1941, amended by chapter 241, *Pamph. L.* 1942) and the "railroad tax law of 1941," *supra.*

The Committee made a second report to the 166th legislature (*Exhibit S-10*) as to the operation of the "railroad tax law of 1941" and suggested amendments which were adopted, but which are not here in issue.

A reading of these reports and of the "railroad tax law of 1941" discloses no intention either on the part of the Committee or on the part of the legislature to disturb the long prevailing and continuously followed method of ascertaining the true value of railroad property here in issue. *Per contra,* these reports and the "railroad tax law of 1941" do disclose an unquestionable intent to ease and make more flexible the burden of taxation of railroad property, by fixing a flat rate of $3 on each $100 of valuation of all property used by a railroad for railroad purposes and by computing the franchise tax based upon earnings of the railroad. The result is that, in comparison with property not used for railroad purposes which is taxed at the average rate of approximately $5 on each $100 of valuation, Central's tax burden was eased or reduced by about forty (40%) per centum.

Notwithstanding this history, and in addition to such factors as allegedly comparable sales, stock and bond method, &c., Central offered proof to the State Board in support of a rather novel method, to say the least, of determining the true value of its property. The validity of the method is the gravamen of this phase of the contest. What is that method?

Central separated the 640 acres which constitute its terminal in Jersey City into two parts. On one part it placed so much of the 640 acres (40%) as were used for rendering common but unprofitable services, such as passenger and marine freight traffic, and in the other part it placed the remaining lands (60%) the use of which (including coal traffic) yielded a substantial profit. It then theoretically stripped all of the acreage of its equipment, its availability and use for railroad purposes. So stripped, it valued the same as comparable property for commercial or industrial purposes. It then took sixty per centum. (60%) of such valuation and the resultant amount was and is urged to be the true value of its property for railroad purposes.

We find no occasion to enter into the realm of theorization, imagination and supposition. To do so would negate the fact that taxation is indeed a complex, living reality. And its solution is sufficiently complicated without making it more so. To do so is moreover to run afoul of the firmly established principle of law that it is the particular or special use to which the railroad property is in fact put which has supported and continues to support its legally favored and separate classification, and which further supports the legislative power to impose a separate and different tax thereon so long as the classification is proper and embraces all property in that classification. *Jersey City* v. *State Board,* 133 *N. J. L. supra* (at *p.* 209).

Central's proof in support of its stated theory has little, if any, value in determining the true value of its property. It may not be substituted for factors embraced within the firmly established and continuously followed method here employed by the Commissioner in determining true value.

That method is not based upon some fixed, unvarying formula. Quite the contrary is the fact. It is as comprehensive

and flexible as the varying circumstances justify so long as such circumstances form "a practical, sound, fair and legal basis for the result." *Central Railroad Co.* v. *Martin,* 114 *N. J. L.* 69, 78; 175 *Atl. Rep.* 637. Many of the circumstances here present (including the stock and bond and earning method) were also, present in *Central Railroad Co.* v. *Martin, ubi supra,* where this court set down factors determinate of the true value of railroad property. It said (at *p.* 75):

"The true value of railroad property is not determined solely by cost of acquisition of land, by cost of improvements and personal property, less depreciation, or reproduction costs less depreciation, but is based upon a consideration of many elements, such as the statutory return made by railroad companies showing the cost and true value of their property as determined by them, a personal examination and investigation of the property, consideration of its physical conditions, usability and location and its proximity to large cities for transportation of freight and passengers and to industrial manufacturing and mining centers, pleasure resorts and ocean and river termini. In valuing structures and tangible personal property, additional elements are frequently considered, namely; cost, or reproduction cost, less depreciation, obsolescence and other elements not reflected in the physical value. All these elements are considered in connection with the railroad as a going concern." *Cf. Central Railroad Company of New Jersey* v. *Martin et al.,* 115 *Fed. Rep.* (2d) 968; *cer. den.,* 306 *U. S.* 651; rehearing denied, 306 *Id.* 669.

This method, by way of examples and not limitations, further requires that property to be assessed, whatever may be its character, is to be taken and valued in the actual condition in which the owner holds it. *State, Colwell, Pros.,* v. *Abbott,* 42 *N. J. L.* 111; *State Board of Assessors* v. *Central Railroad Co.,* 48 *Id.* 146, 278; 4 *Atl. Rep.* 578; *Williams* v. *Bettle,* 51 *N. J. L.* 512; 18 *Atl. Rep.* 750: *The Trustees of Stevens Institute, &c.,* v. *State Board, &c.,* 105 *N. J. L.* 99; 143 *Atl. Rep.* 356; *affirmed,* 105 *N. J. L.* 655; 146 *Atl. Rep.* 919.

This method further requires that consideration be given to the special value of water front lands used, as here, for

railroad terminal purposes. In other words, the location of such lands, its availability for railroad use, the increment, if any, resulting because of the assemblage and consolidation of all the lands as an entirety, are to be considered in connection with the railroad as a going concern. The special value of the lands clothed with the aforestated factors and used accordingly for railroad terminal purpose, has long since received judicial recognition and approval. Said Mr. Justice Garrison: "* * * The difference, however, between the market value of land by reason of its availability for railroad purposes generally, and the value imparted to such land by its specific use under a railroad franchise, is so great as to be fundamental. The latter value is special and peculiar to the individual user of the land, proceeding as it were from within, whereas the former is general and is based upon external conditions susceptible of universal application as a legal measure." *Long Dock Co.* v. *State Board of Assessors,* 78 *N. J. L.* 44, 53; 73 *Atl. Rep.* 53; *affirmed,* 79 *N. J. L.* 604; 80 *Atl. Rep.* 1135; see *Long Dock Co.* v. *State Board of Assessors,* 82 *N. J. L.* 21; 81 *Atl. Rep.* 568; *affirmed,* 84 *N. J. L.* 762; 88 *Atl. Rep.* 1103; *Long Dock Co.* v. *State Board of Assessors,* 89 *N. J. L.* 108; 97 *Atl. Rep.* 900; *affirmed,* 90 *N. J. L.* 703; 101 *Atl. Rep.* 368; *Pennsylvania Railroad Co.* v. *Jersey City,* 98 *N. J. L.* 283; 125 *Atl. Rep.* 921.

Bearing in mind the indicated factors embraced in the stated method and employed by the Commissioner and the Commissioner's right to use his personal knowledge and judgment of the value of the property here in issue (*R. S.* 54:29A–67), and giving careful consideration to all of the proofs, we are confronted with the question as to whether the Commissioner increased the valuations to offset the reduced rate. The answer is clearly in the negative.

*Exhibit S-21* discloses the assessments of parcels 1 to 8, for the period between 1911 to 1942. These parcels embrace all of the water section of the terminal and cover (so it is estimated) about 85% of the 640 acres constituting the entire acreage of the terminal, and equal to about 93% of the total assessed valuations of the twenty-three parcels. The Com-

missioner made a reduction of 10% on these parcels for the years of 1936 and 1939. He has since maintained, including the year 1942, practically the same original assessment rate an acre as that fixed for 1939. The average weighted rate an acre for the period between 1911 to 1942 is $39,237. The rate fixed by the Commissioner for 1942 is below that average weighted rate, whereas that fixed by the State Board is below the average rate of any year during the entire period of 1911 to 1942 with the exception of the years of 1915-1916.

*Exhibit S-58* discloses the assessments for the period of 1911 to 1942 of all the twenty-three parcels. The average weighted rate an acre was $35,510. Here too the assessments for the year of 1942 are less than the stated weighted average for the period from 1911 to 1942. The Commissioner's assessment was at an average of about $2,000 an acre above the minimum during the same period. It is interesting to observe that the State Board's valuation on some parcels is the same as that for which they were assessed for the first time in 1884 by the then Board of Assessors.

Without detailing the voluminous proofs, we are satisfied that they utterly fail to establish reversible error in the Commissioner's valuations. His valuations are right. The State Board's valuations are wrong.

Nor is that result altered by proof as to sales such as the army sale, General Food Co. sale, and others. Admittedly, there has never been a sale of any water front railroad property in railroad use in the history of railroad terminals in Jersey City. The sales mentioned are not comparable either because of location, size, or other special circumstances which defeat the probative force sought to be given to them.

Nor do we think that the urged stock and bond and earning method adversely affects the result reached by the Commissioner. *Cf. Central Railroad Co.* v. *Martin,* 114 *N. J. L.* 69, *supra* (at *p.* 75). We need hardly labor the point that the market value of stocks and bonds of a railroad in bankruptcy does not necessarily reflect the true value of its property for taxation. Nor does the economic value of the railroad necessarily reflect the true value of its property for taxation. Whatever may be the true reasons for Central's

bankruptcy status, and its asserted inability to operate at a profit, be they, as suggested, poor management, favored advantages exercised by its controlling railroads, &c., the fact is that the total assessed value of Central's property (class I and II) according to the State Board, is in round figures about $69,000,000. *In re Pitney, supra* (at *p.* 455). According to *Exhibit S-18* the round net figure is about $75,000,000. But whatever may be the reason which led Central into bankruptcy, its failure to operate at a profit is not in and of itself conclusive evidence that the assessment of its property is unreasonable, nor does it, by like token, operate to relieve it from paying its proportion of the public tax burden. *Cf. West Shore Railroad Co.* v. *State Board of Assessors,* 82 *N. J. L.* 37, 41; 81 *Atl. Rep.* 351; *affirmed,* 84 *N. J. L.* 768; 85 *Atl. Rep.* 826.

### Reduction of Main Stem (Class I) Land Valuations.

The Commissioner fixed the value of $2,338,293 on main stem (class I) lands. The State Board reduced it to $1,540,413, a reduction of $797,880.

Pursuant to *R. S.* 54:29A–17, the Commissioner ascertains the value of these lands according to the following class:

"I. The length and value of the main stem of each railroad and the length of such main stem in each taxing district."

In arriving at his conclusions, the Commissioner treated the lands, including fill, grading, cuts, tracks, &c., save passenger and freight buildings thereon, as an integral part of the main stem (*R. S.* 54:29A–2) from the standpoint of its contribution to the value of the main stem as an entirety. That is the established method which he and his predecessors of the railroad taxing division have followed since 1884. *Central Railroad Co.* v. *State Board of Assessors,* 49 *N. J. L.* 1, 5; 7 *Atl. Rep.* 306. Such a continuously followed method carries weight that it is right. *Cf. Central Railroad Co.* v. *Martin, supra* (at *p.* 78). The resultant valuation by the method employed is reflected in *Exhibit S-59.* That exhibit discloses the weighted average assessment rate an acre for the main stem lands in Jersey City and Bayonne which

are here involved, for the years 1911 to 1942. It shows that during this period the minimum average rate was $16,227 an acre for 1914 and the maximum average rate was $23,041 an acre. The average rate for 1942 was about $18,600 an acre as compared to the maximum rate of $23,041 for the period from 1927 to 1935 and as compared with the weighted average rate of $19,814 an acre from 1911 to 1942. The reduction allowed by the State Board fixes a valuation of $12,256 an acre, a substantial reduction below the lowest valuation during the entire period of 1911 to 1942.

We mark the fact that the Commissioner, in exercising his personal knowledge and judgment as to the value of any property which he is required to assess, originally or on review ($R. S.$ 54:29A–67), made a flat reduction of ten (10%) per centum in 1936 and 1939 on Central's main stem property in the terminal area the same as he did on class II water front lands in that area. The proofs indicate that his action was based upon a consideration of the facts as they truly existed at the time he made his valuations or assessments. Here, too, Central resorts to the suppositious premise of valuing the land stripped of its equipment, availability and use for railroad purposes and, as so stripped, it asserts that the market value thereof is the true value for railroad use. We think that here as in his valuation of class II property, the method employed by the Commissioner was correct.

### Overhead Bridges.

Here, too, pursuant to the time honored construction and practice followed, as in the cases of grade crossings, the Commissioner levied an assessment of $124,485 on some thirty overhead bridges which were owned and maintained by Central and which crossed its right of way. This assessment was made on the premise that the overhead bridges were a part of Central's "main stem," class No. I property, as defined by $R. S.$ 54:29A–2, and, as such, they were used for railroad purposes. $R. S.$ 54:29A–7 and $R. S.$ 54:29A–17.

Central appealed to the State Board. The gravamen of its appeal was that these bridges were not used for railroad pur-

poses and, therefore, they should not have been included in the assessment and taxed by the state, but rather should these bridges, as property not used for railroad purposes, have been assessed and taxed by the same assessors, in the same manner, and at the same rate as the taxable property of other owners in the same taxing district. *R. S.* 54:29A–4.

The State Board concluded that the bridges assessed were used only to support streets or highways crossing the railroad tracks above the roadbed of the railroad; that the streets and highways, supported by the bridges, were used only for pedestrian and vehicular traffic; that a street or highway so used is not a part of the roadbed of the railroad or used in connection therewith; and, *ergo,* such supporting bridges are but a part of the public streets or highways, and are not property used for railroad purposes.

Accordingly, the State Board determined that the Commissioner's assessment should be reduced by $111,251. See, *In re Pitney, supra* (at *pp.* 470, 471). And for an opposite result reached by the State Board on this and other of its holdings, see *Pitney* v. *Kelly, supra* (at *p.* 424).

We are of the opinion—and so hold—that the assessments as made by the Commissioner are correct. It would serve no purpose to detail the conflicting proofs. It should suffice to observe that our reading of these proofs persuasively convinces us that specific railroad use was made of these bridges in addition, if it be an addition, to their pedestrian and vehicular traffic use. Persuasive indeed is the proof given by Mr. Louis Focht. His qualifications as a civil engineer, his many years of practical experience as chief engineer in charge of the State Department of railroad valuations and taxes, give unquestionable weight and force to his testimony. He testified that these bridges are "part of the railroad" and that they "wouldn't be there if the railroad wasn't there."

Additionally, the legislature charged with the knowledge of the continued construction given to the law and to the practice followed by the Commissioner, has given no indication of its disapproval thereof. *Cf. Young* v. *Civil Service Commission,* 127 *N. J. L.* 329; 22 *Atl. Rep.* (*2d*) 523; *Cino* v. *Driscoll,* 130 *N. J. L.* 535, 541; 34 *Atl. Rep.* (*2d*) 6. Nor

does the "railroad tax law of 1941" (*R. S.* 54:29A–1, *et seq.*), work any change in the applicable law upon which the Commissioner's continued construction and practice had been and were here followed. In such circumstances we respect the Commissioner's determinations; it is "strong evidence" that he is "right." *Cf. Central Railroad Co.* v. *Martin, supra* (at *p.* 78).

### Grade Crossings.

Central eliminated a grade crossing in each of the following places, Elizabethport, Cranford, Somerville and Perth Amboy. Each crossing was eliminated as directed by order of the Board of Public Utility Commissioners and in accordance with plans approved by that body. All of the eliminations were completed prior to 1931 save the Elizabethport elimination which was completed after 1931, in fact, sometime in 1940. Central reported the cost of each elimination to the state division of railroad valuations and taxes.

Pursuant to the meaning first given, and thereafter continuously followed to the applicable law for the annual tax levied (3%) upon all property used for railroad purposes (now *R. S.* 54:29A–7) and for ascertaining the value of the "main stem" of each railroad and other real estate thereof used for railroad purposes (now *R. S.* 54:29A–10), the Commissioner assessed each of the stated grade crossings as follows:

### Elizabethport

| | | |
|---|---|---|
| Main stem, interlocking plants, &c. .. | $483,446 | |
| Second class land ................ | 5,000 | |
| Station ........................ | 43,336 | |
| Total ............................. | | $531,782 |

### Cranford

| | | |
|---|---|---|
| Main stem ...................... | $401,925 | |
| Second class .................... | 190,579 | |
| Total ............................. | | $592,504 |

*Somerville*

| | | |
|---|---|---|
| Main stem | $432,010 | |
| Second class | 145,671 | |
| Total | | $577,681 |

*Perth Amboy*

| | | |
|---|---|---|
| Main stem | $292,154 | |
| Second class | 196,595 | |
| Total | | $488,749 |

Central appealed to the State Board. Broadly, but substantively stated, the gravamen of its appeal was that the cost of each elimination was improperly included under *R. S.* 54:29A–10.

The Board held that the assessments on the Cranford, Somerville and Perth Amboy eliminations were proper because each was completed prior to the effective date (December 20th, 1937) of Title 48 of the "Revised Statutes;" that the Tax Commissioner "did exempt the costs of all four grade crossing eliminations named above, in so far as such cost represented the grade crossing as such;" (admittedly, no exemption was allowed for the last three named projects); and that the method employed by the Commissioner was believed by it "to be in accordance to the statute." More as to the method later. Accordingly, the State Board affirmed the judgment of the Commissioner save as to the agreed deduction of $248,666 made on the Elizabethport elimination.

1. Our careful consideration of the holding of the Commissioner and the affirmance thereof by the State Board leads us to hold, as we do, that the exemption provision of the statute (*R. S.* 54:29A–10) is without application as to the Cranford, Somerville and Perth Amboy eliminations. A better understanding of our holding requires a brief analysis of the statutes brought into play.

We begin with *Pamph. L.* 1931, *ch.* 227, *p.* 575. So far as the same is here pertinent, it provides for the exemption of any costs of grade crossing eliminations made pursuant to

*Pamph. L.* 1929, *ch.* 88, and *Pamph. L.* 1930, *ch.* 101. The act of 1929 provides for the elimination of grade crossings, on state highways, for a program for the elimination thereof, for the equal sharing of the costs of such eliminations between the state and the railroad companies involved, and for the adjustment of any dispute arising thereunder by the Board of Public Utility Commissioners. The act of 1930 provides for the elimination of grade crossings on highways other than state highways, and for the power of the Public Utility Commissioner to make such order concerning same as in the circumstances therein set down.

It is clear that the costs of eliminating the three stated projects were not exempt under the act of 1931, because the costs thereof were not incurred pursuant to the 1929 or 1930 acts, the projects having been commenced prior to the dates of those acts.

Central, however, argues that the two later acts, the Revision of 1937 (*R. S.* 54:22-2) and the "railroad act of 1941" (*R. S.* 54:29A–10), amended the 1931 law and exempted all grade crossings from taxation irrespective of the time when such work was commenced. We hold a contrary view.

An examination and comparison of the statutes disclose that the substantive language is identical and reveals a clear intention by the legislature to continue the exemption provisions as circumscribed in the 1931 act. The only change in the later statutes is a redesignation of the same laws cited in the 1931 act. Thus, when the 1931 act referred to *Pamph. L.* 1929, *ch.* 88, the Revision of 1937 and the 1941 act refer to the same 1929 law but designate it as *R. S.* 48:12–68. Similarly, when the 1931 act referred to *Pamph. L.* 1930, *ch.* 101, the Revision of 1937 and the 1941 act designated the same 1930 law as *R. S.* 48:12–61. The redesignation of statutes was not to change the pre-existing law of 1931 but rather to establish uniformity in citations after the adoption of the Revised Statutes of 1937. The reason the 1931 act was incorporated in the Revision of 1937 and in the 1941 tax laws was because the later acts were revisions.

True, the Revision of 1937 is a "wholly independent enactment, superseding all existing general laws." *Duke Power*

*Co.* v. *Somerset County Board of Taxation,* 125 *N. J. L.* 431, 433; 15 *Atl. Rep.* (2*d*) 460. But it is equally true that provisions of the Revised Statutes not inconsistent with those of prior laws are to be construed as a continuation of such laws. *R. S.* 1:1–4. Thus this court in *Crater* v. *County of Somerset,* 123 *N. J. L.* 407, 414; 8 *Atl. Rep.* (2*d*) 691, held that:

"There is a presumption against a legislative intention, by a revision of general laws, to effect a change of substance. That presumption is not, *ex necessitate,* overcome by mere change of phraseology, or the addition or omission of words in the revision; the intention to alter .the essence must be expressed in language admitting of no reasonable doubt of the purpose. *King* v. *Smith,* 91 *N. J. L.* 648; *Newark* v. *Tunis,* 81 *Id.* 45; *affirmed,* 82 *Id.* 461; *Trenton* v. *Standard Fire Insurance Co.,* 77 *Id.* 757; *State* v. *Anderson,* 40 *Id.* 224; *In re Murphy,* 23 *Id.* 180; *Hendrickson* v. *Fries,* 45 *Id.* 555; *O'Hara* v. *National Biscuit Co.,* 69 *Id.* 198."

We find no such legislative intention in the stated provisions of the Revised Statutes as urged for Central.

We therefore hold that the costs of the Somerville, Perth Amboy and Cranford projects are properly assessed.

2. As to the Elizabethport project, the work was commenced pursuant to the provisions of the 1931 act so that the costs thereof are deductible and exempt from taxation. The question raised as to this project concerns the interpretation of the statutory language in the exemption provision, "*   *   * any part of the cost   *   *   * of highway grade crossings." For Central it is argued in substance that this phrase is all inclusive; that it does not justify the exercise of any discretionary power by the Commissioner but rather obliges him to deduct any part of the costs of the elimination which, as observed, was completed in accordance with the orders and plans approved by the Board of Public Utility Commissioners. Here, too, we do not share that view.

We think that the fixed method followed by the Commissioner and approved by the State Board and held to be in accordance with the statute is correct. What is that method? The Commissioner apportions the costs. He exempts only that portion of the essential costs incurred in the elimination

of the grade crossing as such. He includes in his assessment that portion of the costs incurred in the betterment of the railroad however otherwise desirable. And this is so whether betterments or improvements embrace heavier rails, larger and more modern interlocking plants, larger stations, &c.

It will be observed that the quoted phrase specifically prohibits the inclusion of "any part of the cost of * * * elimination * * * of highway grade crossing." It does not prohibit the inclusion of other railroad improvements or betterments. Had the legislature intended to prohibit the inclusion of the cost of other railroad betterments and improvements, it would have provided accordingly. This it did not do, and this we may not do. Obviously, a contrary construction would enable the railroad to take advantage of elimination orders by making betterments and improvements extra those essential to the elimination of the grade crossing, free from the statutory tax.

The assessment on this project and the affirmance thereof by the State Board is proper.

### Reclassification from Class I to Class II Property.

Jersey City claims that certain areas were erroneously classified as class I (main stem) property because they allegedly belong in class II property, and should be reclassified accordingly. This question apparently was not before the State Board but is now before us on the proofs adduced thereon before a Supreme Court Commissioner. We shall consider and determine it on the merits.

The claim of Jersey City is based upon the premise that the Commissioner disregarded the definition of main stem which reads as follows:

" 'Main stem' of a railroad means the roadbed not exceeding one hundred feet in width, with the rails and sleepers, and all structures erected thereon and used in connection therewith, not including passenger or freight buildings erected thereon." R. S. 54:29A-2.

This definition is substantially identical with the meaning given to it by the legislature as far back as 1888. That

meaning received judicial consideration in *Jersey City* v. *State Board of Assessors,* 74 *N. J. L.* 720; 68 *Atl. Rep.* 227, where the Court of Errors and Appeals held (at *p.* 724): "Every railroad must have a main stem. The one hundred feet of main stem of any railroad must, of necessity, be selected from that part of its right of way or roadbed, or other property upon which is laid, or proposed to be laid, the tracks over which its freight and passengers (if it carries passengers) are transported. All tracks outside of the one hundred feet, and the land upon which they are laid, and also tracks used exclusively for chutes into factories, and for yards, and the like, or used in the ordinary transaction of business for cars at rest, are not embraced within this definition, and could not have been intended to be embraced within the term 'main stem' as used in the statute."

Various branches are involved. Our careful examination of the testimony and exhibits satisfies us that here too the method employed by the Commissioner and the result reached by him are correct save in one particular. It was frankly admitted by Mr. Focht that in some instances main stem as assessed or valued exceeded the statutory width limited to 100 feet. This is wrong because it clearly is in excess of the legislative limitation. The phrase "not exceeding one hundred feet in width" is, in our opinion, the maximum assessable width. Thus any footage in excess thereof is not assessable as "main stem" within the statutory definition of that term. It therefore follows that the assessment as made by the Commissioner should not be disturbed except in those instances in which he included, within the area of the "main stem," valuations of any area beyond the statutory width of 100 feet. *Cf. Central Railroad Company of New Jersey* v. *State Board of Assessors,* 75 *N. J. L.* 120, 144; 67 *Atl. Rep.* 672; *affirmed,* 75 *N. J. L.* 771; 69 *Atl. Rep.* 239.

### Structures.

The valuation of some fifty-nine structures on class II property is challenged. The Commissioner fixed a valuation

of $7,801,495 upon these structures. Jersey City contends that they should have been fixed at $10,337,901.01. The Attorney-General resists the increase.

Jersey City relies upon testimony offered on the subject by its witness, Hugh J. Phillips, an engineer, who fixed the value of $10,337,900.01. This witness arrived at his value by first making what is called a "quantitative survey," a breaking down of the costs of the component parts, such as material, labor, &c., of the structures as of the assessing date and then he made a flat 25% reduction of those costs. It is conceded for Jersey City that the method employed—replacement less depreciation—is not the best method of proving the true value of the structures. *Cf. Central Railroad Company* v. *State Board of Assessors,* 49 *N. J. L.* 1; 7 *Atl. Rep.* 306; *Turnley* v. *City of Elizabeth,* 76 *N. J. L.* 42; 68 *Atl. Rep.* 1094. It, however, urges that since its proof is the only proof on the subject such proof is sufficient to sustain its claim. We do not think so.

In addition to the presumption in favor of the correctness of the valuation as made by the Commissioner *(Cf. Central Railroad Co.* v. *State Tax Department,* 112 *N. J. L.* 5, 8; 169 *Atl. Rep.* 489; *cer. den.* 293 *U. S.* 568; 79 *L. Ed.* 667; *New Jersey Bell Telephone Co.* v. *Newark,* 118 *N. J. L.* 490; 193 *Atl. Rep.* 644; *affirmed,* 124 *N. J. L.* 451; 12 *Atl. Rep.* (2d) 675), there is the proof by Mr. Focht, in support of the assessment as made, that the method employed by Mr. Phillips did not comprehend the necessary consideration of the obsolescence and outmoded structures, and, at all events, it was questionable as to whether a good many of the structures would have been rebuilt at the then advanced costs of rebuilding them.

Moreover, it is pointed out that the increase claimed is largely offset by the elimination here of the horizontal reduction in the assessment of these structures, in the year of 1939, of 7½%. The elimination thereof was due, *inter alia,* to the restoration of the use of these structures as of the assessing date for 1942.

The denial of the increase is proper.

### Conclusion.

We repeat, the assessments as made by the Commissioner, save as otherwise indicated, are affirmed. Those made by the State Board to the contrary are reversed. The cause is remitted to the tribunals below there to be treated accordingly. No costs are allowed to any of the parties. *Moore* v. *Splitdorf Electrical Co.,* 114 *N. J. Eq.* 358; 168 *Atl. Rep.* 741.