45 N.J. Super. 49 (1957)
131 A.2d 549
CITY OF JERSEY CITY, A MUNICIPAL CORPORATION, PETITIONER-APPELLANT,
v.
ARMED REALTY CORPORATION AND PENNSYLVANIA RAILROAD COMPANY, LESSEE OF UNITED NEW JERSEY RAILROAD & CANAL COMPANY, RESPONDENTS-RESPONDENTS, AND DIVISION OF TAX APPEALS, DEPARTMENT OF THE TREASURY, STATE OF NEW JERSEY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 18, 1957.
Decided April 25, 1957.
*50 Before Judges CLAPP, JAYNE and FRANCIS.
*51 Mr. Leo Rosenblum argued the cause for petitioner-appellant City of Jersey City (Mr. James A. Tumulty, Jr., Corporation Counsel, attorney).
Mr. George J. Baumann argued the cause for respondent-respondent Armed Realty Corporation (Messrs. Wolf & Baumann, attorneys).
Mr. John F. Lynch argued the cause for respondent-respondent The Pennsylvania Railroad Company (Messrs. O'Mara, Schumann, Davis & Lynch, attorneys).
The opinion of the court was delivered by FRANCIS, J.A.D.
The Hudson County Board of Taxation and the Division of Tax Appeals concurred in a holding that certain land owned by respondent Pennsylvania Railroad Company was in use for railroad purposes and therefore not subject to local assessment by appellant Jersey City. Consequently, the assessments for the years 1952, 1953 and 1954 were vacated. The city now challenges the legal propriety of the action on this appeal.
Attention may be drawn to the locus about which the controversy centers, by a general reference to it as the Journal Square station of the Pennsylvania and Hudson and Manhattan railroads. Just west of this point, the right of way passes under Hudson Boulevard, running through a deep cut, the tracks being about 40 feet below grade. The land on which the city imposed the assessment is about 24,000 square feet. In this area there are two sets of tracks, station buildings, various small necessary structures, the columns that support the buildings, the rocky slope supporting the embankment on the south side of the cut, the overhead catenary and other incidental apparatus. It is undisputed that the entire 24,000 square feet are in railroad use and necessary for that use.
The passenger station was built about 1912; it houses the joint facilities of the Pennsylvania and the Hudson and Manhattan lines. On the northerly side, the roof of the westerly portion of this structure extended to and was substantially *52 at the street grade of Hudson Boulevard, and about a story above the passenger platform. On the southerly side, originally this westerly portion did not extend to the northerly line of Concourse East, a public street intersecting the Boulevard; there was an open area about 20 to 30 feet in width which began at the Boulevard and continued along the Concourse a distance of about 130 feet to the westerly line of the above grade section of the station. At the easterly end, the roof of the building was and is about two additional stories above grade. This portion is the station proper (the principal entrance being from the Concourse), where the ticket offices, etc., of the railroads and some independent commercial activities of tenants, such as a news and magazine stand, candy and bakery shops, and lunch counters are located. The entire station and platforms from westerly to easterly extremities are supported by pillars which run through the passenger platforms to the ground. Prior to 1952, the land and structures described were admittedly in railroad use and were taxed as such.
In 1948 the Pennsylvania leased what have been designated certain "air rights" to one L.N. Rosenbaum. The lease is unusual in that it did not carry any land with it; in fact it excluded from the grant the areas "below a horizontal plane drawn at elevation of 91.7" and "drawn at elevation 70.50," these elevations representing roof top levels of the station structures. Under it the lessee acquired the right to erect a building which would cover the roof top of the part of the station which, as indicated, was built to the grade of Hudson Boulevard, project across the 20 to 30 foot open area on the south to the northerly line of the Concourse, and extend east and west from the Boulevard to the westerly wall of the main and higher portion of the station. Such a two-story brick building was then constructed by respondent, Armed Realty Corporation, as sublessee. It fronts on the Boulevard and extends along the Concourse to the westerly wall of the station. For its full depth on the northerly side it rests on the westerly projection of the station and is supported by the same pillars as the station. On the southerly *53 side seven steel columns and their footings were placed on the land surface of the cut, three of them being at least partly built into the rock embankment of the cut. On these columns rest the beams which support the floor of the southerly side of the building; they were erected in the extremely narrow space between the tracks and the side of the cut, and they represent the only additional physical occupation of land as the result of the new edifice Aside from them, all support is derived from the old station structures and the original pillars on which they rest. The visual effect is that the addition is simply a continuation of the old station and within its wall lines as projected. The operation of the trains has not been at all affected; they now pass under the building. The overhead catenary and other incidental equipment are attached to its floor beams. About 90% of the entire new construction is actually superimposed on the old station building. The overall railroad use continues unabated.
Upon completion the stores in the new building were rented by the sublessee to tenants for private retail commercial enterprises. One of the stores contains an entrance to a stairway leading down to the station. Since 1952 the new structure has been assessed locally by appellant at $225,000 and the taxes paid. No issue is raised with respect to the propriety of that assessment.
For many years down to the present time, pursuant to N.J.S.A. 54:29A-16, Jersey City has reported the 24,000 square foot land area involved in these proceedings as land used or owned for railroad purposes. Specifically, the statute requires local assessors, on request of the Director of the State Division of Taxation, to certify and send to him "a short description of all the real property in their respective taxing districts used or owned for railroad purposes" (except main stems). The Director is vested with the jurisdiction and is under a mandate to assess such property "in the manner and at the rates" provided by the Act. N.J.S.A. 54:29A-7. And he is directed to determine the true value of all real estate in each taxing district in the State which *54 is used for railroad purposes, "including the roadbed (other than main stem), tracks, buildings, water tanks, riparian rights, docks, wharves and piers, and all other real estate, except lands not used for railroad purposes." N.J.S.A. 59:29A-17. (Emphasis added)
Pursuant to the certification of the city that the entire area in question is devoted to railroad use and is necessary for such use, the Director has assessed it for the years 1952, 1953 and 1954. No appeals were taken by the city under N.J.S.A. 54:29A-31 from his assessments and the taxes resulting therefrom have been paid. According to N.J.S.A. 54:29A-11, taxes so assessed "shall be in lieu of all other State or local taxation of or measured by property taxable hereunder."
In spite of the concession that all of this land is devoted to and essential for railroad purposes, the city undertook to assess and tax it again locally for the same years. The asserted basis for the right to do so is N.J.S.A. 54:29A-4, which says:
"All the property of a railroad company not used for railroad purposes shall be assessed and taxed by the same assessors, in the same manner and at the same rate as the taxable property of other owners in the same taxing district."
The assessments were lodged against the lessee, Armed Realty Company, instead of against the railroad owner. Objection is made on this score but it has no substance. According to N.J.S.A. 54:4-54, "No assessment * * * shall be considered invalid because listed or assessed in the name of one not the owner thereof * * *." See also N.J.S.A. 54:29A-39. Becker v. Mayor and Council of Borough of Little Ferry, 126 N.J.L. 338 (E. & A. 1941); 2 Cooley, Taxation (4th ed. 1924), § 958.
In support of taxability under the quoted section of the act, N.J.S.A. 54:29A-4, the argument is made that the land is devoted to a double use, namely, a local commercial use superimposed upon a railroad use. More specifically, it is said that the 24,000 square foot land area supports not *55 only the railroad tracks, equipment and station, but also the new building which rests on top of the station structures and to some extent on the seven additional columns on the southerly side. The insistment is that in order for respondent's building to remain in its elevated position, it draws a measure of support from every square foot of the area, just as the railroad plant and equipment do; and therefore to that extent the land is devoted to a local commercial use justifying the very substantial municipal assessments that are under attack.
As already indicated, on appeal the county tax board vacated the land assessments and the Division of Tax Appeals affirmed the order. Since the city and state assessments represented dual impositions, the jurisdiction of Division of Tax Appeals could have been invoked in a summary fashion to determine the character of the property, whether it is used for railroad purposes and by which agency it should be assessed. N.J.S.A. 54:29A-43.1.
In enacting the Railroad Tax Law of 1948, N.J.S.A. 54:29A-1 et seq. (as well as its progenitors), obviously the intent of the Legislature was to commit the assessment of property used for railroad purposes to an agency which would operate at the state level. It intended to occupy the field, N.J.S.A. 54:29A-11, for the purpose of avoiding varying methods and standards of valuation by the different municipalities in which the property is located, and to secure uniform assessment. Three classes of such property were established: Class I  main stem; Class II  real estate used for railroad purposes (except main stem), and Class III  all tangible personalty of the railroad. N.J.S.A. 54:29A-17. The tax revenue produced from Classes I and II is allocated to the State. N.J.S.A. 54:29A-23. The entire amount of that derived from Class II based on the Director's assessments at true value is granted to the taxing districts where the property is located. N.J.S.A. 54:29A-24.
The city urges that the statutory preemption does not bar local assessment of Class II land, even though *56 throughout its length and breadth it is devoted to railroad use, if an independent unrelated and incidental commercial use is superimposed on the railroad use. The second level use, it is said, qualifies the property for double assessment as property "not used" for carrier purposes under N.J.S.A. 54:29A-4, supra.
Two cases, In re United New Jersey Railroad and Canal Co., 75 N.J.L. 334 (Sup. Ct. 1907), and Erie R. Co. v. Kelly, 131 N.J.L. 602 (Sup. Ct. 1944), are cited as sanctioning local assessment for such hybrid or dual use.
In the United New Jersey Railroad and Canal Co. case, the company's passenger terminal and ferry house at the foot of Exchange Place, Jersey City, were subjected to municipal assessment. The ferry was being operated to transport persons and property across the Hudson River in connection with its trains. The ferry house was a two-story frame building with concrete walls; the upper story consisted of a lobby used by train passengers to get from the train shed to the ferries. The lower floor was used principally by local passengers, wagons and trucks in boarding the lower deck of the boats. The whole of the terminal property and buildings, including the land under water, had been assessed by the State board. The Supreme Court sustained that part of the city assessment as related to the lower floor of the ferry house, saying:
"With regard, however, to so much of the lower floor of the ferry house beneath the lobby, which * * * was mainly devoted to the accommodation of the local passengers, trucks and vehicles from Jersey City and vicinity in reaching the ferry for passage and incident thereto, this we think is subject to local taxation, and as to that part the city assessment should stand and the state assessment should be reduced accordingly. The remainder of the building and lands was properly assessed by the state board, and as to that part the city assessment must be abated or reduced so as to leave it untaxed by local authority." (Emphasis added)
In the evaluation of this case as a precedent, aside from the administrative difficulties attendant upon separation of uses for individual treatment, it may be noted that the act out of which the litigation arose, L. 1888, c. 208, § 9, *57 p. 274; 3 Gen. Stat. 3327 (1896), provided for assessment of Class II property at true value and at the local rate, but limited the tax payment thereon to a maximum of one percent of its valuation (a limitation which no longer exists). Thus the municipal receipts upon allocation by the State might be less in a particular situation than the full revenue if based entirely upon true value at the prevailing local rate. This fact was adverted to in State Board of Assessors v. Central R. Co., 48 N.J.L. 146, 276, 281, 305 (E. & A. 1886), which contains seven majority and dissenting opinions dealing with and sustaining the constitutionality of the earlier act, L. 1884, c. 101, § 12, p. 147, which made the same provision for taxation of Class II property. Whether the possibility that a citizen property owner assessed and paying at true value would bear a greater share of the local tax burden than the carrier stimulated the liberal judicial construction by the Supreme Court in favor of partial local assessment, can only be conjectured.
It is observable, also, that considerable emphasis was placed on the fact that the main or principal use of the lower floor was for local and non-railroad purposes. This may be contrasted with the situation involving a portion of the second floor of the ferry house where a restaurant was conducted. About 90% of the patronage came from train passengers and only 10% from the general public. This subordinate use did not permit local taxation. Id., 48 N.J.L., at page 339.
The opinion contains no discussion of another problem of substantial proportions. Assuming justification for the view that a portion of the use of the property was non-railroad, did not the language of the statute reveal a design to have double use cases handled administratively by the State board  especially since the revenue from Class II subjects went to the local districts anyway?
In an earlier case, In re Assessment of Property of Central R. Co., 72 N.J.L. 86 (Sup. Ct. 1905), part of the property assessed by both city and State consisted of a wharf and trestle. The trestle was used exclusively by the railroad *58 company for delivery of coal to the Communipaw Coal Company, the coal being dumped directly from the cars into the holds of vessels lying at the wharf. The coal company had an office on the wharf for the transaction of its business at that point. The Supreme Court held that the trestle and wharf were in railroad use and cancelled the city assessments. But that imposed locally on the coal company's office was sustained. 72 N.J.L., at page 89.
In the same litigation, double assessment was imposed on a plot about 600 feet long and 150 feet wide, lying in the railroad terminal yard. Running through the middle of it were three tracks used by cars transporting structural iron for the Fuller Construction Company. The open ground adjoining the tracks was used by Fuller for unloading the iron brought in, assorting it for reshipment on the carrier's cars and reloading it on them for other destinations. The property was declared to be in railroad use and the city's levy was vacated. 72 N.J.L., at page 91.
In a still earlier case, Camden & Atlantic R. Co. v. City of Atlantic City, 58 N.J.L. 316 (Sup. Ct. 1895), affirmed 60 N.J.L. 242 (E. & A. 1897), a problem of double taxation was presented. The railroad company maintained a steam railroad between Camden and Atlantic City which was still in operation, although apparently only infrequently at the time in question. The company also owned a power house, dynamos, poles, wires and cars used in connection with the operation by it of an electric railway over the same tracks. The city subjected the whole of the property to local assessment but the Supreme Court voided the levy on the tracks, saying that they must be deemed in railroad use and therefore assessable only by the state board. The significant factor here is that although the principal use was not for railroad but rather for local street railway purposes, yet the matter of assessment was left exclusively in the hands of the state board without any suggestion of proration. The conflict between this view of the Court of Errors and Appeals and the opinion of the Supreme Court in the later United New Jersey Railroad and Canal Co. case, supra, is quite apparent.
*59 Then, in 1910, the Court of Errors and Appeals, in Lehigh Valley R. Co. of New Jersey v. Jersey City, 80 N.J.L. 298, squarely recognized that the Legislature had barred local assessment of second-class property which is used for railroad and a non-railroad use, and had vested sole authority to assess in the state agency.
A warehouse pier owned by the carrier, and on which its tracks were laid, was used by it for the handling of freight upon discharge from cars preparatory to being transshipped by lighters and barges to different points in the harbor. A single product, flour, was delivered there and it was consigned to a single firm which used the pier also for the purpose of blending the flour. For this use a demurrage charge was made. It appeared also that the consignee was allowed to have some machinery there without charge. Chief Justice Gummere, who wrote the opinion for the court, said:
"* * * The question therefore, which the case presents for determination is whether a piece of property owned by a railroad company, and used partly for railroad purposes and partly for other purposes is assessable and taxable by the state board of assessors or by the taxing authorities of the taxing district in which it is located." 80 N.J.L., at page 300.
Then, in reference to the creation of the state board:
"* * * The scheme thus initiated by the Legislature dealt solely with the imposition of taxes upon the property of these corporations used or held for railroad purposes, and left such of their property as was not so used or held  in other words, property not suitable and proper for carrying into execution the powers granted to them  to be assessed and taxed by the same methods as theretofore provided; that is, by the taxing authorities of the various taxing districts in which such property was located, and at local rates. * * * In order that this intention should not fail it provided a perfectly plain test for determining whether a given piece of property should be taxed by the method provided by the act, or by the local authorities in the place where it was situate. That test is use for railroad purposes. If such a use is found to exist, then that property is to be valued and assessed for taxes by the state board of assessors, * * *. It may be conceded that the legislature, if it had thought proper to do so, might have provided for the taxation of property of these corporations which was subject to a double use  that is, property which was used for railroad *60 purposes and also for other purposes  either wholly or partially by the taxing board of the municipality in which it was located. This, however, it did not see fit to do by the act of 1884, or by any supplement to that statute which it has subsequently enacted. On the contrary, it declared that only property which is not used at all for such purposes shall be taxed by the local authorities, and that `all other property' of these companies shall be taxed by the state board of assessors. Such a legislative declaration leaves no room for construction. To hold that property used for railroad purposes shall be taxed by the local authorities rather than the state board of assessors, when it is made to appear that another use is also imposed upon it, is not a construction of the words of the act, but judicial legislation. Perhaps such a method of taxation is more desirable than that provided by existing legislation, but whether that method shall be put in force is a matter to be determined not by the courts, but by the legislative department of the government."
In spite of this unequivocal declaration, the controlling legislation remained the same during the intervening years and it was carried without material change into the 1948 revision which is now before us. Even the "in lieu of" provision, N.J.S.A. 54:29A-11, 74.1, which appeared as section 1 of L. 1884, p. 142, has been perpetuated. The impact of such legislative acquiescence cannot be overlooked. Miller v. Board of Chosen Freeholders, 10 N.J. 398, 413 (1952); cf. State v. State Board of Tax Appeals, 134 N.J.L. 34, 41 (Sup. Ct. 1946), affirmed 135 N.J.L. 481 (E. & A. 1947).
The next decision of significance in our progress toward the present is Hoboken v. State Board of Equalization of Taxes, 83 N.J.L. 784 (E. & A. 1912). Here both the City of Hoboken and State Board assessed the main ferry terminal building and the land on which it was located. As in the United New Jersey Railroad and Canal Co. case, supra, it appeared that the first floor of the building was used in the main for local travel purposes and the remainder for railroad use. On appeal the State Board of Equalization cancelled the city assessment on the land entirely because of its devotion to railroad use and reduced that imposed on the building to the fractional part representing the local use of the first floor of the ferry building. On certiorari, the Supreme *61 Court affirmed because it regarded the United New Jersey Railroad and Canal Co. opinion as binding, saying:
"This case is binding upon this court and to the extent to which it has gone, viz., as applicable to a building or buildings it must be sustained. But under the phraseology of the act above stated, the principles enunciated in this case should not be extended any further and will not be made applicable to the same plot of ground upon which is located a building thus jointly used for local and railroad purposes upon which an assessment has been apportioned in the above manner." 83 N.J.L., at page 787. (Emphasis added)
When the matter reached the Court of Errors and Appeals on appeal by the city, the judgment was sustained with this short per curiam opinion:
"This case was decided by the Supreme Court prior to the decision in Lehigh Valley R. Co. [of New Jersey] v. Jersey City, 80 N.J.L. 298. Our decision in that case justifies the result reached by the Supreme Court in the present case. It is unnecessary to decide whether that result does justice to the railroad company since they do not appeal. The judgment is affirmed, with costs." 83 N.J.L., at page 787.
This decision clearly establishes that land in railroad use may not be assessed locally even though a portion of the building resting on it is put to non-carrier purposes. And the rather cryptic statement about the effect of failure of the railroad to appeal, viewed against the background of the strong language in the recently decided Lehigh Valley case, gives the impression that the city assessment of the ferry building might well have been set aside in full had such additional review been sought.
Finally, we reach Erie R. Co. v. Kelly, supra, on which appellant relies chiefly. In that cause both the State Tax Commissioner and the city assessed a tract of land and a warehouse building located thereon. Only 8% of land and building was used for railroad purposes; the balance was leased privately as a warehouse. The record showed that the portion of the building reserved to the railroad was physically separated from the remainder of the structure by a solid wall *62 from floor to ceiling. The Supreme Court held that the land and building should be assessed locally to the extent of the non-carrier use. The opinion summarily disposes of the Lehigh Valley decision as involving "other provisions of law."
Judicial motivation for the result announced is not difficult to discern. The assessments were made under L. 1941, c. 291. Under that statute, the State Commissioner was obliged to determine true value of Class II railroad property, but the tax burden was limited specifically to a rate of 3% on such value. L. 1941, c. 291, § 7; N.J.S.A. 24:29A-7. And the court plainly indicated its unwillingness to accept the argument that premises used 92% locally for revenue producing purposes should have a tax benefit of the difference between the 3% and the prevailing municipal rate.
The railroad tax law of 1948 which now controls, requires the State Director to ascertain the true value of Class II property in railroad use and assess it not at 3% but at the pertinent local rates, N.J.S.A. 54:29A-19, and, of course, the entire proceeds are remitted to the taxing district, N.J.S.A. 54:29A-24. We assume that under the recent decisions of the Supreme Court in Baldwin Construction Co. v. Essex County Bd. of Taxation, 16 N.J. 329, 340 (1954), and Delaware, L. & W.R. v. Neeld, 23 N.J. 561 (1957), his determination of true value is required to reflect the condition and entire character of the use of the land at the time he is called upon to act.
Problems of railroad taxation frequently are complex and cause conflicts of jurisdiction between local and state assessing authorities. A perfect system of taxation in that field has yet to be devised; there is always room for criticism that in some way or other an existing system does not provide absolute equality or uniformity. Practical problems and issues of local and state authority necessitate the solutions that experience has shown are the most feasible and expedient. Central R. Co. of New Jersey v. Thayer-Martin, 114 N.J.L. 69 (Sup. Ct. 1934); In re State Railroad Tax Cases, 92 U.S. 575, 23 L.Ed. 663 (1876). Many jurisdictions *63 follow the general statutory scheme pursued by New Jersey. Annotation, 80 A.L.R. 252 (1932).
According to the A.L.R. annotation, the prevailing view is that the resolution of such jurisdictional disputes depends upon the principal use of the property in question. If railroad, then assessment is in the hands of the state; otherwise the local assessor controls. 80 A.L.R., at page 255. The theme of the United New Jersey Railroad and Canal Co. and Erie R. opinions seems to represent a middle ground, namely, that each agency should assess in proportion to the use assigned to its jurisdiction. But the sense of Lehigh Valley is clearly that only second-class property not at all in railroad use may be treated locally. These cases are all the product of their particular statutory environment. However, currently the legislative language is substantially the same as it has always been with respect to the scope of the state administrator's authority to assess Class II property in railroad use, but now he is directed to fix its true value, tax it at existing local rates, and remit all the revenue therefrom to the proper municipal governmental unit. So there is much persuasive force to the argument that in the light of the long acquiescence in the Lehigh Valley doctrine and the present broad statute, the Legislature intended to have property which was used at all or used substantially, as distinguished from "principally," for railroad purposes, assessed administratively at the state level by the Director of Taxation. But such an all embracive decision is not necessary in the situation now presented and our determination should be limited to the precise problem.
Only the land assessment is involved here. Everyone concedes that the land is all devoted to and necessary for railroad use. When the new building was superimposed on existing station structures and pillars and began to receive support from the land, the overall railroad use did not change. The function added on to that existing use is incidental and subordinate, and under the Lehigh Valley and Hoboken as well as Erie R. doctrines the land is clearly *64 beyond the assessment authority of the city assessor. Cf. City of Jersey City v. Lehigh Valley R., 9 N.J. 362, 367 (1952).
A somewhat similar situation was dealt with by the Illinois Supreme Court in People ex rel. Anton v. Atchison, T. & S.F. Ry., 225 Ill. 593, 80 N.E. 272, 274 (1907). The railroad maintained a bridge over the Mississippi over which its trains passed. The bridge was a steel structure resting on piers, consisting of eight steel trusses. Attached to its sides were steel brackets extending out eight feet therefrom, on which wagon roadways were laid. The roadways were shut off from the tracks located in the center of the bridge by wooden screens and were protected by a railing on the outside. Tolls were charged by the railroad for passage over them. It was held that there could be no local assessment, even for the wagon-roads portion of the bridge. The court said:
"Again, the roadways are a part of an indivisible structure, which is not susceptible of separation into a railroad bridge and a toll bridge without total destruction of the roadways. A material part of the assessment made by the board of review in this case is the right to have the roadways attached to the railroad bridge as they are now attached and to have the support furnished by the bridge and piers without which the roadways are worthless. The entire bridge has been assessed by the state board of equalization, and the taxes have been paid; and, while the assessment of the roadways by the state board would not bind the local assessor, if the board had no authority to assess them as a part of the bridge * * *, the assessment of an easement in the bridge and the support furnished by it and its piers is an attempt to again tax, to that extent, property which has already been properly assessed and taxed. The bridge proper is a part of defendant's railroad, and properly classified as railroad track, and it is impossible to divide the structure into independent parcels. The toll roadways are mere appendages, and to separate them from the steel girders and deprive them of the support of the bridge would render them of no value. As the different parts of the bridge properly cannot be assessed independently, the property must be assessed as a unit, and its character as a railroad bridge or toll bridge must be determined for the purpose of taxation. We think that it must be classified for that purpose according to its primary and principal use. If property is used mainly for railroad purposes, it will not lose its character as railroad property for the reason that it is not used exclusively for such purpose."
*65 A similar decision was reached in St. Louis Bridge Co. v. Becker, 372 Ill. 102, 22 N.E.2d 954 (Sup. Ct. 1939), where a vehicular and pedestrian toll highway was laid across the upper deck of a railroad bridge. The upper deck was said to be simply incidental to the railroad use, indivisible from it and not assessable locally.
It seems to us that under our statute the legislative design is to have the assessment in cases like the present one handled administratively by the Director. In this way confusion, overlapping valuations and possibly double taxation will be avoided. In discussing the same dilemma, the Supreme Court of Nebraska, in Chicago, B. & Q.R. Co. v. Box Butte County, 99 Neb. 208, 155 N.W. 881, 883, 884 (1915), had this to say:
"It is not the policy of the law to create dissensions or difference of views of jurisdiction or to cause double or conflicting assessments. Some articles of property are plainly assessable by the state board; others are as plainly subject to local assessment. There are articles of property in regard to which it is not so easy to determine whether they should be assessed locally or are within the jurisdiction of the state board as part of the railroad entity. If these doubtful cases are determined by local assessors, there will be a variety of conclusions and no uniformity and no equality between different localities. The state board, with the assistance of its experts, is better qualified to determine what articles of property are essentially a part of the railroad * * *."
Consideration of the authorities discussed and the peculiar facts and circumstances of the case, has led us to the conclusion that the railroad land in question cannot be assessed by the appellant. Accordingly, the order of the Division of Tax Appeals is affirmed.