THE STATE, THE PRESIDENT, MANAGERS, AND COMPANY FOR ERECTING A BRIDGE OVER THE RIVER DELA-WARE AT THE BOROUGH OF EASTON, PROSECUORS, v. ALBERT K. METZ, COLLECTOR, &c., OF THE TOWN OF PHILLIPSBURGH.

1. Assessors of townships are required to take an official oath that they will truly, faithfully, honestly, and impartially, value and assess the ratable estates in their townships, and that in making such assessments they will, to the best of their knowledge and judgment, observe the directions of the law respecting the same, and make a true return, &c. The 14th section of the act of 1862 requires, all assessors shall assess and value property at its full and fair value, and at such prices as in their judgment said property would sell for at a fair and *bona fide* sale by private contract; and that every assessor shall annex to his duplicate an oath or affirmation, in writing, that all assessments in his duplicate have been made according to the requirements of that section. In this case the assessor of Phillipsburgh, having taken the proper oath of office and made his assessment, annexed to the duplicate returned by him, an affidavit that the statements contained in the assessment

State, Easton Delaware Bridge Co., Pros., v. Metz.

were true, to the best of his knowledge and belief. It was *held* sufficient.

2. Every assessor should take the oath directed in the 14th section of the act above referred to as a directory requirement of the law, but the omission to do so does not vitiate the assessment.

3. In estimating the value of a toll bridge owned by an incorporated company, for the purpose of assessment, the franchises of the company or the profits from the tolls are not to be considered.

4. In valuing the prosecutors' bridge over the Delaware at Phillipsburgh for the purpose of assessment in this state, the one half of the bridge, including the abutments and piers to the centre of the river upon the New Jersey side, should be estimated at its full and fair value at the time of the assessment, as part of the structure, without reference to the extent of travel upon it or the profits derived therefrom.

5. In this estimate may also be considered the value of the land occupied by the abutments, its location, and other relative circumstances which regulate the value of land generally; but in no case should the extent of profit in its use, under the franchise of the company, be taken into account.

On *certiorari.* In matter of taxation.

In 1864 the prosecutors were owners of a bridge over the Delaware river, between Easton, in the state of Pennsylvania, and Phillipsburgh, in this state; part of the structure, with its abutments, being in one state, and part in the other.

The part in this state was valued by the assessor of the town of Phillipsburgh at sixty thousand dollars, and the tax levied upon that valuation was $1272, besides $60 for school tax—the total amount being $1332.

The prosecutors appealed to the proper commissioners for a reduction of the tax, but not obtaining relief, they removed the proceedings into this court by *certiorari.*

Various reasons were assigned for setting aside the assessment. Those principally relied on were the following:

1. That the assessor did not annex to his duplicate an oath or affirmation that all the assessments had been made according to the requirements of the law; that the oath only set forth that the statements contained in the assessment book were true, to the best of his knowledge; and did not correspond with either his oath of office or the oath required by the 14th section of the act of 1862.

2. That the real estate of the prosecutors in the town of Phillipsburgh was valued in said assessment at sixty thousand dollars, which greatly exceeded the full and fair value thereof, and was much more than the same would have sold for at the time by private contract.

3. That the valuation and assessment were made upon erroneous principles.

Much testimony was taken by both parties, designed to show the value of the bridge as a simple, material structure, and also its value as connected with the privileges to which it was entitled, and the receipts and profits derived from it by the owners.

For the plaintiffs, *J. F. Dumont* and *A. G. Richey.*

For the defendant, *D. A. Depue.*

The opinion of the court was delivered by

BEDLE, J.    This *certiorari* brings to this court for review, the assessment for the year 1864, against the prosecutors, in the town of Phillipsburgh.    The property assested consists of one half of the bridge over the river Delaware, at Easton and Phillipsburgh, including the abutments and piers to the middle of the river, on the New Jersey side.    It is termed in the duplicate *real estate,* and is assessed as such.    The valuation of the assessor is $60,000, and total tax assessed is $1272, besides $60 school tax—making in all $1332.    Application was made by the company to the town council of Phillipsburgh sitting as commissioners of appeal, for a reduction of the assessment, and they refused to reduce it.

The first objection against the assessment to be considered is, that the assessor did not annex to his duplicate an oath or affirmation, in writing, that all assessments in said duplicate contained had been made according to the requirements of section 14th of the supplement of March 28th, 1862, to the act concerning taxes.    The assessor annexed to the duplicate an affidavit, " that the statements contained in the

within assessment book *is* true, to the best of his knowledge and belief." The counsel for defendants insists that the assessment is not necessarily void for want of the affidavit, and that if it is necessary to the validity of the assessment, that the affidavit annexed is a substantial compliance with the 14th section. The oath required of the assessor to take and subscribe, upon his election to office, is, that he will faithfully, honestly, and impartially *value* and *assess* the ratable estate, &c., and that in making such *valuation* and *assessments* he will, to the best of his knowledge and judgment, observe *the directions of the law* respecting the same, and that he will make a true return of all such assessments to the board of assessors, &c. *Nix. Dig.* 877.* The assessor of the town of Phillipsburgh, although elected under its charter, is required to take and subscribe that oath, and in the absence of evidence to the contrary, it is presumed that he has complied with the law. The 14th section referred to imposes a duty upon the assessor to assess and value property at its full and fair value, &c. In the performance of that duty he acts under his oath of office. The assessment is made under that oath, and no other. By its terms he is to observe the directions of the 14th section, as particularly as though it was specially referred to in the oath.

The 14th section directs the principle upon which the assessment and valuation are to be made, and the oath of office obliges him to observe it. The oath referred to in the 14th section, does not impose any new duty upon the assessor as to the *principle* or the *manner* of making the assessment. After the assessment is made and the duplicate is prepared, it simply directs the assessor to annex an oath, that the assessments have been made according to the requirements of that section. It does not make the assessor any more bound to do what he may swear he has done, than what he was bound to do by his oath of office. The language of the oath of office is as broad, so far as the duty of the assessor goes in making the assessment, as the oath referred to in the 14th section. Under

*Rev., p. 1196, § 19.*

these circumstances, that oath will be considered only as directory, and not as a necessity to the assessment. It ought to be taken by every assessor as a *directory* requirement of the law, and no assessor fully performs his duty without it; yet its absence is no reason to set aside the assessment. The assessor in this case, it would appear, intended to comply with the act and annexed the oath, but whether it so substantially answers the law as to relieve him from *laches* in the discharge of his duty and liability thereby, it is not now necessary to determine.

The next question is, whether the property was rightly assessed? It consists of the one half of the bridge, including abutments and piers, upon the New Jersey side, to the centre of the river. It is assessed to the prosecutors, a private corporation under the laws of Pennsylvania and New Jersey, as real estate of such corporation *situate within this state*, and particularly within the limits of the town of Phillipsburgh. That this same property was taxable as real estate within the township of Phillipsburgh, before the creation of the present *town* of Phillipsburgh, was settled by this court in the case of *The State* v. *Metz*, 5 *Dutcher* 122, and it is not disputed that the boundaries of the *town* of Phillipsburgh now include it. Whether this corporation is liable to have its capital stock and surplus (which surplus appears to have been taxed in Pennsylvania) taxed in this state as a domestic corporation, and the assessed value of its real estate to be deducted therefrom, is not now the question. The present assessment is only upon the real estate, and the point in this connection to be determined is as to its valuation. The correctness of this assessment will depend upon the *principle* to be adopted in ascertaining the value of the property. The witnesses on the part of the prosecutors generally, and some on the part of the defendant, estimate the value of the whole bridge, including abutments and piers, at from $25,000 to $60,000. These estimates are based upon the material value of the bridge as a structure, without reference to the franchises of the company, or the income of the bridge, or the amount of travel. The witnesses of the defendant generally estimate its value at from $120,000 to $200,000.

These estimates are based not only upon the value of the bridge as a structure, but upon the fact that it is a toll bridge, owned by a company, with the right of taking tolls; that the travel is large and income very profitable.   The counsel for defendant insists that although it would not be lawful to tax the franchises of the company, and although the tolls from the bridge may not be taxable *per se*, yet that these rights and profits of taking toll are connected with the property and may be considered in determining its value.

There is a great distinction between the franchises of a company under its charter, and the material things contemplated by it and necessary to its objects.   There is a value about each.   In this case the rights of the prosecutors, under their act of incorporation, to build a bridge and to take tolls, are matters of value apart from the structure.   They are not liable to be taxed under our present tax laws, except only so far as they may be reached in the capital stock and surplus, if to tax such is legal.   If the bridge should be destroyed these rights would still exist, and as such could not be taxed; and if rebuilt, its value should not be enhanced by the peculiar franchises or profits of the company.   The franchises do not connect themselves to the bridge, as determining its value—the bridge is only the material means to their enjoyment, and has an ascertainable value in itself. In ascertaining the value it should be considered as a bridge, as just what it is, disregarding the question of profit or loss in its use.   It would not do to say that without the rights of toll it would be worth nothing except for old lumber, and that, therefore, to give it value these rights must be estimated. It is in fact a bridge, with a distinctive character, as a house, a store, or a mill, and should be valued at what it is.   If it appears that that bridge was not necessary to be kept up between Easton and Phillipsburgh, and that it stood there going to decay, the wants of the people not requiring it, its peculiar value as a bridge might be decreased or entirely merged into old lumber; but maintained there as a bridge, it should be so considered in the estimate.   It can hardly be

conceived that this bridge is not necessary to the public, and that it will not be kept up, either by a corporation or some public authority. It is there now and so used, and has been for over half a century, and must continue to be used and needed as a bridge. It should be valued as a bridge, as distinguished from the value of the material to be converted into something else. A building expressly fitted up for a bank, with its vaults and arrangements, would be valued independently of the profits that could be made there under its charter. The adaptedness of the building for a bank would be taken into the estimate of value, but not the franchises or profits of the corporation owning and using it; and so in this case, the adaptedness of the structure for the purpose intended should be considered in fixing its value. It is true that real estate, ordinarily, has a relative value depending upon its location, the business and wants of the neighborhood in which it is situate, and the usual circumstances of growth and trade. These are general considerations, and with others of like character are undoubtedly elements of value and likely to affect any property, and may properly be regarded by the assessor in fixing the full and fair value of real estate generally; but they are different from those peculiar rights or franchises which are granted by act of the legislature, having in themselves value, and for the enjoyment of which, real estate may be necessary as a means or object, and without which the real estate would be valued only according to the relative circumstances of any other property.

The 14th section of the supplement of March 28th, 1862, makes it the duty of the assessor to assess and value property at its full and fair value, and at such prices as, in his judgment, said property would sell for at a fair and *bona fide* sale by private contract, at the time such assessment is made. It may be difficult to apply this test, as it is hardly probable that the bridge would be sold independent of the franchises of the company. That clause in the act was intended as a general test of values, and in many cases its application would, in the nature of things, be difficult. If it could not

be satisfactorily applied it would still be the duty of the assessor to get the *full and fair* value of the property, according to some other more practical way; but, applied to this case, the bridge should be taken separately from the franchises and the income derived thereby. The test would not necessarily require the separate sale of the bridge. The sale would be based upon the idea that a purchaser could be found who wished to buy it as a bridge, and a willingness on the part of the owners to sell. A dwelling-house would be valued at what the owner could get at an ordinary *bona fide* sale, from a person who wanted to buy it—the owner being willing to sell. The company, desiring to sell, might not find purchasers for the bridge without the franchises, unless it be sold to the public authorities, who might in justice be obliged to maintain it for the public necessities. The test could only practically be applied upon the possibility of purchasers being found who desired to buy. Such purchasers would, in all probability, be confined to those who would buy in connection with the franchises or to the public authorities. Supposing, then, the company were willing to sell the bridge and the franchises, and purchasers were found willing to buy, the consideration of the sale on the part of the vendors would have the two elements of value—the franchises and the bridge. The value of the bridge, as such, could be computed, it being a material thing—and the value of the franchises would depend upon the profits that might be derived from their enjoyment. In such a case it would be fair to consider that the bridge could be used and maintained as a bridge, but the profit of the use under the franchises should not be considered in the estimate of the bridge.

If the test of a sale to the public authorities is taken, they being the most likely purchasers without the franchises, then the question would be, as to what would the bridge sell for at a fair and *bona fide* sale to them, without the franchises, to be used as a bridge for the public?

The following considerations should be observed by the assessor in making the assessment:

1. The franchises of the company or the profits from the tolls, are not to be taken in estimating the value of the bridge. To estimate them would be an indirect mode of taxing corporate rights, not contemplated by the tax law. The same principle was announced by this court in the case of *The State* v. *Flavel & Fredericks,* 4 *Zab.* 384, wherein property owned by the Society for Establishing Useful Manufactures, at Paterson, was sought to be valued by reason of the value of the water power and of the rents derived therefrom, which were exempt from taxation. The Chief Justice, in his opinion, uses this language: "The enhanced value placed upon the land of the prosecutors by reason of the value of their water power, and of the rents derived therefrom, is obviously but an indirect mode of taxing property of the company, which is exempted from taxation by their charter. In this respect the assessment is erroneous."

2. The one half of the bridge, including the abutments and piers to the centre of the river upon the New Jersey side, should be estimated at its *full and fair value* at the time of the assessment, as part of the structure used as a bridge, without reference to the extent of travel upon it, or the profits derived therefrom; but taking the fact that it is a bridge, the ingredients of value are the materials and labor that would be necessary in its construction, as constructed, and its condition as to soundness. In this estimate it would also be proper to consider the value of the land occupied by the abutments and in connection with it, as affected by its location, *and those relative circumstances to which I have referred which regulate the value of land generally;* and if the same has a peculiar value by reason of its location for the abutments or termination of a bridge, it is proper to consider that, but in no case should the extent of profit in its use under the franchises of this company be estimated.

3. The test of a sale should be applied according to the principles before stated. It is unnecessary to again particularly refer to them.

Under these considerations and the testimony in the cause,

State, Easton Delaware Bridge Co., Pros., v. Metz.

it appears that the assessment is too great; that the same was made upon an erroneous basis of valuation and should be reduced. It is hardly necessary to refer the matter to a commissioner, as the evidence is full enough for the court to reach a conclusion of value sufficiently just for the assessment in question. The valuation of the bridge can hereafter be regulated upon the principles here stated, without reference to the amount to which the same is now reduced.

I think, upon a careful examination of the testimony, that the valuation should be reduced from $60,000 to $25,000.

There is nothing in the other reasons sufficient to set aside the assessment, and they need not be considered in detail.

Assessment reduced.