16 N.J. Super. 543 (1951)
85 A.2d 200
DELAWARE, LACKAWANNA & WESTERN RAILROAD COMPANY, PLAINTIFF-APPELLANT AND RESPONDENT,
v.
CITY OF HOBOKEN, AND OTHERS, DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 17, 1951.
Decided December 10, 1951.
*548 Before Judges JACOBS, EASTWOOD and BIGELOW.
Mr. Raymond J. Lamb argued the cause for the appellant and respondent, D.L. & W. Railroad Company (Messrs. Markley & Broadhurst, attorneys; Messrs. Edward A. Markley and Donald R. Creighton, of counsel).
Mr. Milton B. Conford argued the cause for respondents and cross-appellants, City of Hoboken and City of Jersey City (Mr. Dominick J. Marrone, attorney for City of Hoboken; Mr. John B. Graf, corporation counsel and attorney for City of Jersey City).
Mr. Benjamin C. Van Tine argued the cause for the State of New Jersey (Mr. Theodore D. Parsons, Attorney-General).
BIGELOW, J.A.D. (for the court, and also dissenting in part).
In the greater part of this opinion I have the honor to speak for a unanimous court, but at the very end, and that is the most important part, my role becomes one of dissent. The dissent will be plainly designated in order that there may be no uncertainty in that regard.
This matter is before us on cross-appeals from the action of the Division of Tax Appeals settling the assessment of second-class railroad property of the Delaware, Lackawanna & Western Railroad Company lying in Hoboken and Jersey City. The Director of the Division of Taxation, pursuant to the Tax Law of 1948, L. 1948, c. 40, §§ 8 and 9; N.J.S.A. 54:29A-17 and 18, assessed the property at $16,011,234. Both the taxpayer and the cities, dissatisfied, appealed to the Division of Tax Appeals, where the assessments were increased by $1,823,393 to $17,834,627. And now the parties are here. Before going at all into the facts, certain questions of law propounded to us may be considered.
*549 The railroad company urges that the valuation found by the Director of the Division of Taxation is still presumably correct, despite the determination by the Appeals Division. The argument is based principally on a provision of the Railroad Tax Act of 1948 which empowers the Director (who in this respect has succeeded to the powers of the State Tax Commissioner) and anyone who is "delegated by him to value and assess property in railroad use," "to use his personal knowledge and judgment as to the value of any property which he is required to assess, upon original assessment or upon review thereof." N.J.S.A. 54:29A-67. (The review mentioned at the end of the passage is a review by the Director of his own assessment, and not a review thereof by some other authority or tribunal, such as the Division of Tax Appeals.) This authority of the Director  but not of his delegate  to use his personal knowledge and judgment, had been possessed by his predecessors in the function of assessing railroad lands since 1884. L. 1884, p. 142, §§ 15 and 20. It is in substance the same as the authority of local assessors to use their knowledge and judgment in valuing taxable property under the General Tax Law. R.S. 54:4-23; State v. Metz, 31 N.J.L. 378 (Sup. Ct. 1865); State v. Tindall, 36 N.J.L. 97 (Sup. Ct. 1872). And see 61 C.J., Taxation, § 790, p. 640. When the assessment of the township or other local assessor is reviewed on certiorari, the assessment is presumed to be correct and the objector has the burden of proving otherwise. State v. Abbott, 42 N.J.L. 109 (Sup. Ct. 1880). It has been said that the proofs must show "a clear error" in the valuation or the assessment will be upheld. Estell v. Hawkens, 50 N.J.L. 122 (Sup. Ct. 1887). Likewise, there is a strong presumption that the assessment of railroad lands made by the Director is correct, when it is the subject of appeal or certiorari. Central R.R. v. State Board, 49 N.J.L. 1 (Sup. Ct. 1886); Long Dock Co. v. State Board, 82 N.J.L. 21 (Sup. Ct. 1911), affirmed 84 N.J.L. 762 (E. & A. 1913). Although it has frequently been said that the great weight given to the valuation made *550 by the Director  or his predecessors  is the result of his power to use his personal knowledge, we incline to believe that the true reason is the broad experience the Director and his staff have had in the field of valuation of railroad properties. When we recall that the railroads which the Director must assess extend into every county and even into every considerable municipality of the State, it is evident that the personal knowledge of the Director plays a small part in his assessments, compared with the role of personal knowledge of municipal assessors.
But the assessment that we are called upon to review is not that of the Director; the assessment before us is the one made by the Division of Tax Appeals, and that is the assessment now presumed to be correct. Kearny v. Board of Equalization, 81 N.J.L. 106 (Sup. Ct. 1911); Colonial Life Ins. Co. v. State Board, 126 N.J.L. 126 (Sup. Ct. 1941). This is in accordance with the principle that the burden is always on an appellant to show that the judgment of which he complains is erroneous. Donofrio v. Haag Bros., 10 N.J. Super. 258 (App. Div. 1950); McGowan v. Peter Doelger Brewing Co., 10 N.J. Super. 276 (App. Div. 1950). We go one step further. The question before us is not whether the Appeals Division gave sufficient weight to the appraisal of the Director. The question put to us by the Legislature is whether the final determination of the Appeals Division, in respect to the assessment, is "illegal, excessive, insufficient, or that there has been illegal discrimination in the assessment." If it is so made to appear, we "correct, adjust and equalize such assessment and tax or refer same back" to the Director. L. 1941, c. 291, § 37; N.J.S.A. 54:29A-37. The valuation of the Appeals Division must be sustained unless the evidence preponderates against it.
Before turning to our next topic, we would mark the differing natures of the actions of the Director and of the Division of Tax Appeals. The action of the Director is strictly administrative. He makes his assessment without notice to the taxpayer and without taking evidence, although *551 he will review the assessment at the request of the taxpayer. N.J.S.A. 54:29A-18; L. 1948, c. 40, § 9. But this review is "a mere revision and not an appellate review." Tuckerton R.R. Co. v. State Board, 75 N.J.L. 157 (Sup. Ct. 1907). By contrast, the proceeding before the Appeals Division is judicial in nature and in method. The party aggrieved by the assessment of the Director files a complaint, a hearing on notice is had, proofs are submitted, and a determination of the appeal is made, based upon the evidence which has been submitted to the Appeals Division. The proceeding is a trial de novo. There is no room here for the undisclosed personal knowledge of the Director or of members of the Division. The determination must be supported by the record. Giordano v. City Commission, 2 N.J. 585 (1949). Until 1933, when an administrative appeal was first provided (L. 1933, c. 305, § 2; R.S. 54:26-7), the assessment made by the State Board of Assessors, or whatever might be the title of the administrative body charged with assessing railroad lands, was reviewed in the first instance in the Supreme Court on certiorari. There the assessment was accorded great weight, as we have pointed out  more weight probably than is now given to the determination of the Appeals Division, although that determination is presumed to be correct. In the instant case, only half of the members of the Division  those constituting the panel  heard the witnesses and the oral arguments of counsel; the other members of the Division had to rely on the typewritten transcript and briefs. We have before us all the proofs that were before the Division and in a form more convenient for study. But there seems to be no necessity for, and no advantage to be gained by, attempting to measure the strength of the presumption in favor of the assessment made by the Appeals Division.
The Attorney-General, intervening in behalf of the railroad appellants, argues that it was a prerequisite to a determination by the Division of Tax Appeals that they take the testimony of the Director in order to learn what was the *552 basis of his valuation; that since neither of the parties produced the Director as a witness, the Division, on their own motion, should have taken his testimony. The testimony of the Director as to material facts within his own knowledge might have been presented to the Appeals Division, just as the testimony of a juror in a negligence case may be taken if it so happens that he saw the accident that is the subject of the trial. State v. Langhans, 94 N.J.L. 17 (Sup. Ct. 1919), 95 N.J.L. 213 (E. & A. 1920). So the Director, if he personally examined the property of the railroad, could testify to what he saw; if he was cognizant of any sales of comparable properties, he might testify about the sales. As a witness to facts relevant to the fair value of the property, he would be on the same footing as any other witness and the admissibility of his testimony would be governed by the same rules. But the Director could not be questioned as to the operation of his mind in valuing the property  what factors were considered by him, what weight he gave them, what inferences he drew, and how he reached his conclusions. Long Dock Co. v. State Board, 86 N.J.L. 592, 597 (E. & A. 1914); Chicago B. & Q.R.R. Co. v. Babcock, 204 U.S. 585; 27 S.Ct. 326 (1907). There is no indication that the Director had any knowledge that might properly have been the subject of testimony by him before the Division of Tax Appeals. If either litigant before the Appeals Division surmised that the Director had such knowledge, doubtless he would have been asked to testify. The Tax Division was under no obligation to call him.
The municipalities base their chief argument on "tax history." The assessments of the properties now under consideration and of all railroad waterfront properties in Jersey City and Hoboken, were reduced ten per cent in 1936 from the valuations of the late 1920s. In 1939, there was a second ten per cent reduction and since then the assessments of the particular lands here in question have remained level, neither raised nor lowered, except for the reduction in 1949 made by the Director and cancelled by the Appeals Division. *553 Between 1939 and January 1, 1948, land values generally increased in value, and the municipalities claim that the lands now under consideration likewise increased in value during the same period. In this situation, argue the municipalities, the Division was bound to set aside the reduction made by the Director, and also to increase the assessment above prior years.
It must not be forgotten that each annual assessment of property for taxation is a separate act and independent of the assessment of the same property for other years. United New Jersey, etc., Co. v. State Board, 103 N.J.L. 33 (Sup. Ct. 1926). An argument substantially the same as that now presented to us, was characterized in In re New York, etc., Co., 5 N.J. Super. 156 (App. Div. 1949), as "without force because assessments are made each year and the valuations of one year are not conclusive or binding for the following year. Such prior valuations were merely circumstances for the State Board to consider. It is also possible that the valuations for the prior years were not at true value." The doctrine of res judicata does not apply, notwithstanding intimations to the contrary in Pitney v. State Board, 136 N.J.L. 157 (Sup. Ct. 1947). But, of course, tax history of the kind presented to us is relevant and may be forceful proof. Hackensack Water Co. v. State Board, 129 N.J.L. 535 (Sup. Ct. 1943), affirmed Hackensack Water Co. v. North Bergen, 130 N.J.L. 483 (E. & A. 1943); Jersey City v. State Department, 136 N.J.L. 353 (Sup. Ct. 1947). There ought to be a certain degree of stability in tax assessments.
In 1936 and 1939, as we have seen, the valuation of railroad lands in Jersey City and Hoboken were lowered 19 per cent beneath the figures of 1924 to 1935. In 1944, the county board reduced the assessment of 80 per cent of the parcels of land in Jersey City, not including land used for railroad purposes. Counsel for the municipalities admits that the reduction was approximately 36 per cent of total land assessments in Jersey City, and that a similar reduction in *554 Hoboken amounted to about 18 per cent. The company points out that unless the assessments of second-class railroad lands are brought into line with the local assessments, the railroads have to bear a disproportionate share of the tax load.
The Railroad Tax Act of 1884, § 4, dealt with the possibility that real estate other than railroad lands might be assessed by the local assessors at a relatively lower scale than the assessed value laid upon railroad land in the same taxing district. In such event, the State Board of Assessors was required to accept the valuation of the local assessors as a correct standard of value and thereby correct or reduce the railroad assessment. But our Supreme Court, in Central R.R. Co. v. State Board, 49 N.J.L. 1 (1886), held that the constitution required the State Board to assess the railroad land at "true value" whether or not the local assessor fixed his assessments perhaps as low as 40 per cent of true value. As a result of this decision, the provision of the 1884 statute, which we have just mentioned, was omitted from the 1888 Railroad Tax Act, L. 1888, p. 269.
A discrimination between taxpayers, so that one is assessed upon the full value of his property and others are assessed upon only a fraction of full value, violates the Fourteenth Amendment to the Federal Constitution. Mere errors in judgment do not support a claim of discrimination, for there must be something which in effect amounts to an intentional violation of the essential principle of practical uniformity. Where  as in New Jersey  most land is assessed by local authorities, but certain land is assessed by a body of state officials, then, if there is systematic undervaluation by the local authorities, while the state officials, though presumably aware of such local undervaluation, yet make their assessments upon full value, a case of unlawful discrimination is presented. It was formerly considered that the only remedy of the taxpayer who was the victim of the discrimination was a proceeding to increase the assessments of other taxpayers, but now we recognize that such a remedy is not enough and *555 that he may rightfully demand that his own assessment be reduced to the common level. The constitutional mandate to assess at full value must yield to the even more fundamental requirement of relative equality. Greene v. L. & I.R. Co., 244 U.S. 499; 37 S.Ct. 673 (1917); Sioux City Bridge Co. v. Dakota County, 260 U.S. 441; 43 S.Ct. 190 (1923); Hillsborough Township v. Cromwell, 326 U.S. 620; 66 S.Ct. 445 (1946).
It was probably in recognition of this principle of constitutional law that our Legislature in 1933 inserted in the Railroad Tax Act a provision similar to that which had been held ineffective by our Supreme Court in 1886. If any party in interest claims "that there has been illegal discrimination in the assessment of * * * property * * * under" the Railroad Tax Act, "as compared with the assessment of property generally" under the General Tax Law, and if it shall be made to appear "that there has been illegal discrimination in the assessment, the board shall correct, adjust and equalize the assessment and tax of such property." The last passage quoted was also written into the provision for review on certiorari. L. 1933, c. 305, § 2; R.S. 54:26-7, 9 and 12. The 1941 revision of the Railroad Tax Law omits the detailed description of the claim of discrimination and merely directs that a written complaint shall be filed "specifying the grounds of complaint and the relief sought"; but the statute still directs on the appeal to the Division of Tax Appeals and on judicial review, that the assessment shall be equalized if it appears "that there has been illegal discrimination in the assessment." L. 1941, c. 291, §§ 31, 33 and 37; N.J.S.A. 54:29A-31, 33 and 37. We conceive that under the revision of 1941 (now named the Railroad Tax Law of 1948) just as under the statute of 1933, where the Director's assessment of second-class railroad lands is based on a higher norm of true value than the municipal assessment of comparable property in the same taxing district, or where the one is based on 100 per cent of true value and the other is systematically set at a fraction of true value, the Division of Tax Appeals, on *556 proper complaint and proof, should equalize the assessment by lowering the assessment on second-class railroad property. It would seem to follow that the Director, making his assessment of railroad property in any given taxing district, may and should have in mind the established custom of the municipal assessor.
But discrimination is not assumed. It must be alleged in the complaint to the Appeals Division and proved, or else the railroad company is not entitled to relief on that score. In the present instance the company did not charge discrimination and the evidence does not indicate discrimination either in the original assessment of the Director or in the revised assessment of the Appeals Division. The subject of the general trend of land assessments in Jersey City and Hoboken will be touched on a little later.
A question of the law of evidence is presented. Mr. Stewart, one of the valuation experts for the municipalities, had made inquiry concerning the rental of piers along the river front in Jersey City and Hoboken, and drawn a schedule showing the results of his inquiry. All the information contained in the schedule he obtained from the lessors or lessees, or by examination of the leases. This data was a factor in his reaching an opinion of the value of the company's waterfront property. Over objection that the schedule was built on hearsay, the panel of the Appeals Division received it in evidence. Several other schedules with a somewhat shaky foundation were received. For example, Floor Area of Piers in New York and other Ports; Tonnage in and out of Port of New York through New Jersey Rail Terminals. We prefer not to consider evidence that a court ought not accept, and will deal with the question presented by the admission of the rent schedule as if it had been a court and not an administrative body sitting.
The modern trend in the law of evidence favors both a liberal rule of admissibility and the giving of a broad discretionary control to the trial judge. The present rule in many, perhaps in a majority, of American jurisdictions permits an *557 expert witness as to value to base his opinion on those sources of information to which business men usually resort, and allows the witness to divulge to the court the data on which his opinion is based, even though hearsay testimony is thus presented. 32 C.J.S., Evidence, § 545, p. 289. Our standard of true value is the price a willing purchaser and a willing seller would agree upon. Murphy v. West New York, 132 N.J.L. 111 (Sup. Ct. 1944). The expert witness should consider the same elements as would willing and intelligent buyers and sellers; he may rely upon the same sources of information that they would use. As Chief Judge Parker pointed out in U.S. v. 25,406 Acres of Land, 172 F.2d 990 (4th C.C.A. 1949), since the court adopts the standards of the market place in making valuations, there is no reason why it should close its eyes to how the market place arrives at and applies the standards. And see the opinion of Chief Justice Maltbie in Vigliotti v. Campano, 133 A. 579 (Conn. 1926). Also Baltimore v. Hurlock, 78 A. 558 (Md. 1910); and Davenport v. Haskell, 200 N.E. 409 (Mass. 1936).
There are several aspects of the use of hearsay as a basis of expert opinion. First, its effect on the opinion itself. A medical opinion is no better than the data on which the doctor relies, and so the court will receive his opinion which is based in part on what someone told him, only if the circumstances carry a strong likelihood that he was told the truth. Cf. State v. Gedicke, 43 N.J.L. 86 (Sup. Ct. 1881), with Birtwistle v. Public Service Ry. Co., 94 N.J.L. 407 (E. & A. 1920). In determining the fair value of land, we picture a bargaining process carried on in the same manner in which real bargains are struck. The participants accept as fact whatever seems to them reliable. A widely believed report, though erroneous, may have real influence on the price. And so an appraisal based on such reports may be more accurate than if the expert were confined to facts duly proved. See R.S. 2:101-1. A second facet of the problem is illustrated by State v. Gedicke, supra, where the physician was permitted to repeat to the jury what his patient had told *558 him about her symptoms. Wharton's Crim. Ev., § 518. Such testimony may incidentally bear on the question of liability and should therefore be received reluctantly, for it may influence the jury on that issue, even though they be instructed to disregard it except for the purpose of weighing the expert's opinion. But in the case before us, no such obstacle to the reception of the schedule of rents existed. The rents were not in issue; for the only question before the Tax Appeals Division was the value of the company's lands.
A third factor in a complicated valuation proceeding like the present is convenience. The hearing in the matter before us, took all or parts of 27 days; the appendix runs to 3,000 printed pages. If each pier owner had been called to testify, if all the data relied on by the experts had been established by witnesses having first-hand knowledge, the hearing might have been two or three times as long as it was. The cumbersomeness of the process would well nigh have defeated justice. It is because practical convenience requires it that schedules prepared by the expert on valuation, or his staff, and not proved otherwise than by the oath of the expert that he believes them credible, are constantly received by commissions and courts when valuing public utility systems as a step in rate making. The same considerations in a case like the present justify a departure from the strict rule enunciated in Essex County Park Com. v. Brokaw, 107 N.J.L. 110 (E. & A. 1930). We find that the Division of Tax Appeals properly received the schedules now in question.
Now at last we come to the facts. The land which is the subject of the appeal, comprises two separate tracts. One is the Lackawanna's main terminal on the Hudson River, and the other is a yard at Eleventh Street, Hoboken, three-fourths of a mile north of the terminal. Only the land itself, not the buildings or improvements, are involved. Of the terminal tract, 50.4 acres, including the ferry lot, lie in Hoboken and 132.4 acres are in Jersey City. For a decade, the Hoboken part of the terminal had been assessed at $93,312 an acre, *559 and the Jersey City land at $92,340. The Director reduced the assessment of the entire tract to $83,100 an acre and the panel recommended that the old assessments be restored, making a total of $16,935,302. The Eleventh Street property, which is mostly under water, comprises two adjoining parcels, the Ocean tract of 5.3 acres, and the Manor tract, 7.6 acres. The Director assessed the former at $66,650 and the latter at $60,750 per acre. The panel recommended increasing the assessments to the figures of prior years, namely, $74,052 per acre for the Ocean tract and $67,518 for the Manor tract, making $905,325 for the whole.
The panel stated the reason for its recommendations as follows:
"There was no basis for the action of the Director in reducing the assessment of the waterfront railroad parcels and in making the reduction the Director fell into `palpable error.' The testimony proves conclusively, particularly by reason of the admissions made by George Goldstein, expert for the railroad, that there was no change in value between January 1, 1947, and January 1, 1948."
The Appeals Division, adopting the recommendations of its panel, gave no reason for its decision.
The only ground given by the panel for increasing the assessment to the level of prior years was that "there was no change in value between January 1, 1947, and January 1, 1948." The insufficiency of this reason seems obvious. In the first place, it is impossible to detect and measure changes in the value of such property as a railroad terminal  or real estate generally  in a one-year period. More important, as pointed out in In re New York, etc., Co., 5 N.J. Super. 156 (App. Div. 1949), the assessment as of January 1, 1947, may not have been correct. If the Director can reduce or increase an assessment only to the extent of the change in value since the year before, any error in the assessment will be carried on forever.
The municipalities and their experts before the Appeals Division, like their counsel before us, when considering changes in value, did not confine their attention to a single *560 year but rather to a period of nine or ten years, and attempted to show an increase in value. Of course, they could not cite sales of great rail terminals, but they did prove sundry land sales in Jersey City and Hoboken, and also stressed more general factors such as tonnage moving through New York harbor, population, growth in the metropolitan district, etc. It may be noted, however, that neither Hoboken nor Jersey City has shared in the general population growth. The following census returns are not without significance:

 Jersey City Hoboken
 1930 ................. 316,715 59,261
 1940 ................. 301,173 50,515
 1950 ................. 300,447 50,510

In the two decades, one of the cities has lost five per cent, and the other 15 per cent of its population.
Both parties ask us to take judicial notice of the land assessments in the two cities. The following table, culled from the abstracts of ratables contained in the annual reports of the Division of Taxation and its predecessors, may throw some light on the trend of land values. The last three figures for each item are omitted:

 JERSEY CITY HOBOKEN
 ----------- -------
 Land (except 2nd class Land (except 2nd class
 R.R. land) R.R. R.R. land) R.R.
 without Property without Property
 improvements improvements
 ------------------------- --------------------------
1920 ...... $107,297 $61,253 $30,701 $7,955
1925 ...... 144,834 108,441 33,750 11,817
1930 ...... 210,856 116,935 36,816 11,992
1935 ...... 210,917 125,786 35,825 11,861
1940 ...... 195,757 105,121 30,456 9,033
1945 ...... 110,913 111,972 22,271 8,589
1946 ...... 115,037 112,715 23,300 8,621
1947 ...... 113,733 112,753 23,782 8,653
1948 ...... 110,101 113,019 23,689 8,620
1949 ...... 108,106 100,798 23,117 7,962

*561 The 1949 assessment of railroad land given above is that made by the Director, and does not show the figures as increased by the Appeals Division. The schedule of assessments plainly shows a shifting of an ever larger share of the cost of government to railroad lands from other lands. In 1930, the valuation of second-class railroad lands in Jersey City equalled 56 per cent of the assessment of other lands; in 1949, the railroad assessment fixed by the Appeals Division topped that of other lands.
Despite the dwindling assessments on lands other than those in railroad use, we know that land values generally in Jersey City and Hoboken were higher in 1948 and 1949 than in the depression year 1938 and the more normal 1939. That does not necessarily mean that land was under-assessed in 1948 and 1949, for it is more likely that lands generally were assessed much above true values in the depression years. Assessments had to be maintained at a high level, regardless of actual values, lest the cities should become bankrupt. The slump in values that occurred before 1935 was not reflected in the tax assessments for ten years thereafter.
The 1949 assessment on the Lackawanna terminal lands in Jersey City as determined by the Appeals Division is 19 per cent, and as set by the Director is 27.1 per cent lower than the 1930 assessment, while the assessments of Jersey City lands in the aggregate were 48.7 per cent lower in 1949 than in 1930. In Hoboken the general reduction was 37.2 per cent. The course of assessments of railroad lands contrasted with other lands suggests a question whether the fall of values in the 1930s was given adequate effect in the assessment of second-class railroad property before the Director, in 1949, made the 10 per cent reduction that the Appeals Division cancelled. Certainly we cannot adopt the syllogism which the municipalities press on our attention: The value of the company's second-class land was higher January 1, 1948, than in 1938 and 1939; ergo the assessment ought to be higher.
*562 Several experts gave their opinions as to the value of the lands, at a rate per acre:

 The Terminal Yard including Ferry Lot.
Fugazzi Stewart Mantell Robertson Goldstein Stack
$130,680 130,000 138,000 115,000 47,916 47,000
 Eleventh Street, Hoboken.
 Fugazzi Goldstein Stack
$104,544 34,848 37,000

The weight to be given to an expert's appraisal of land depends on his candor, his intelligence and knowledge, and especially on the facts and reasoning which are the foundation of his opinion. 20 Am. Jur., Evidence, § 1206; 32 C.J.S., Evidence, § 569, p. 405; Stackhouse v. Horton, 15 N.J. Eq. 202 (Ch. 1854); Loveridge v. Brown, 98 N.J. Eq. 381 (E. & A. 1925). The Appeals Division, little impressed by any of the appraisals, fixed the assessment of so much of the Terminal as lay in Jersey City at $92,340, and the Hoboken part at $93,312 an acre; and the Eleventh Street land, part at $74,052 and part at $67,518 an acre. We, too, have found slight help in the experts' valuations of the company's lands; their partisanship is too evident. But their discussion of the subject has been of assistance, as have some of the facts stated by them.
Mr. Stewart, one of the experts for the municipalities, stated the factors he took into consideration in determining the value of the company's lands:
"The first factor was a careful inspection and investigation of the parcels, particularly the railroad terminal zone, waterfront zone. I considered the waterfront tract, due to its size, shape, location, development and assemblage to be peculiarly available and adaptable to railroad terminal use.
Second, I considered the location of the parcels in relation to industrial, business and residential areas; to highways, ferries, tunnels and bridges; to the channels in the Harbor; its proximity to the center of marine activity of the Port and to its immediate location in the general railroad terminal area.
*563 Third, I considered the access by water, rail and highway.
Fourth, I considered the utility of the property in conjunction with a utility study of the waterfrontage from Constable Hook, Bayonne, to the Edgewater Ferry at Edgewater.
Fifth, I made an exhaustive study of the sales and leases of waterfront properties, particularly on upper New York Bay and the Hudson River on the New Jersey Shore.
Sixth, I made an analysis and study of the various waterfront parcels listed for sale over a period of time, indicating the supply and demand.
Seventh, I made a study of important trends affecting the value of real estate, such as a warehouse occupancy survey, an industrial occupancy survey, sales and resales of industrial and commercial properties, improved and vacant; American Railway statistics; commodity prices; construction contracts and similar elements.
Eighth, my general knowledge, experience and judgment secured through study and over twenty years in the real estate business in selling, leasing and appraising property."
The end and purpose of an expert's labors is a sum of money  a valuation stated in dollars. We realize how difficult is the problem of value in a case like this, and how necessarily tenuous and indistinct is the connection between the valuation and the data on which it is supposed to rest. And yet there must be a perceptible connection, a relation that enables us to render judgment, that can be translated into figures  not exact figures, but rough approximations at least.
The first factor of Mr. Stewart was the adaptability of the property to railroad terminal use "due to its size, shape, location, development and assemblage." Later, he testified that he added to what we may call the ordinary value of the land approximately ten per cent "for assemblage or plottage," and 15 per cent for special "value for railroad use." We interpolate a word of caution. The fitness of the land for railroad purposes generally is a proper element of its value, but any increment in value depending on use by the Lackawanna for railroad purposes, that is under its franchise, must be disregarded. Long Dock Co. v. State Board, 78 N.J.L. 44 (Sup. Ct. 1909), affirmed 79 N.J.L. 604 (E. & A. 1910). *564 Cf. State v. State Board, 134 N.J.L. 34, 44 (Sup. Ct. 1946), affirmed 135 N.J.L. 481 (E. & A. 1947). Mr. Stewart's second, third and fourth factors are several phases of location. The factor of location enters into the value of all real estate and is reflected in sales of comparable property, which is the subject of the fifth factor. Location also enters into the peculiar value of the terminal land for railroad use, for which Mr. Stewart allowed 15 per cent, as we have already said. The sixth heading, supply and demand, also finds its result in the sales which take place. The seventh factor, trends affecting values, is summed up by another witness for Jersey City, Mr. Mantell, who estimated that the terminal land was worth 20 per cent more in 1948 than in 1938.
A proper factor in reaching a value of the company's property is prices realized on sales of other lands. Long Dock Co. v. State Board, 89 N.J.L. 108 (Sup. Ct. 1916), affirmed 90 N.J.L. 701 (E. & A. 1917). Indeed, a study of such sales is the basic, essential factor. Without proof of purchase prices, all the other elements mentioned by the witnesses have no force. Before we can add ten per cent for plottage, or 15 per cent for railroad use, we must derive from sales of other lands a figure on which we may calculate the percentages. Unless we can check the estimates of value against actual sales, an assessment of $250,000 an acre, and one of $25,000 an acre, are equally plausible, and equally arbitrary. But see State v. State Board, 134 N.J.L. 34 (Sup. Ct. 1946), affirmed 135 N.J.L. 481 (E. & A. 1947).
A great element in value of both properties of the company is the frontage on the waters of New York harbor. Of course, not all waterfront property in that great port is of high value. South Brooklyn, the East River, North River, Newark Bay, the Arthur Kill, and other waters of the port area, provide a length of shore line far in excess of any maritime or other demands that require immediate access to water. But the west bank of the Hudson, from Jersey City to Guttenberg, a little over nine miles, has great value, especially for railroad purposes. And the Lackawanna has *565 half a mile of waterfront in one of the choicest parts of this stretch. What we may call the waterfront influence on value probably lessens as the distance back from the water increases. A plot 1,000 feet deep, fronting on the water, is not necessarily worth twice as much as a lot with the same frontage but having a depth of only 500 feet. If a person were trying to assemble such a parcel, he would expect to pay more per acre for the land along the water than the land in back. Yet all the experts, as well as the Appeals Division, valued each tract of the company's land as a whole, at so much an acre, and not at one rate for the front and another for the back. A railroad water terminal must have depth, great depth, and a very large area. And, of course, it is true that a large tract may well be worth more than the total of its parts taken separately. Long Dock Co. v. State Board, 89 N.J.L. 108 (Sup. Ct. 1916), affirmed 90 N.J.L. 701 (E. & A. 1917). Hence, the increment allowed for "plottage."
The property of the company at Eleventh Street is the remainder of a tract that the company has held for a good number of years. Mr. Eastburn, the company's tax and land agent, testified that the company decided in 1925 to place the whole tract in the market for sale but that no serious offer was received for a dozen years. In 1938, 10.4 acres were sold to General Foods Corporation for $295,000, or an average price of $28,330 per acre. Of that lot, 3.9 acres were under water and 6.5 acres were "upland," that is, filled land. In 1947, a small additional parcel was sold to General Foods, .4 of an acre, for $14,826, or $38,155 an acre. This lot was all dry land.
After these sales, the company still retained 12.9 acres at Eleventh Street, but the land above water is less than three acres. Five and a half acres are under water behind the bulkhead line, where the company has a right to fill if it determines that course is desirable. Nearly five acres, also under water, lie between the bulkhead line and the pierhead line and can be used by the owner only for the construction of piers and for navigation, and all use is subject to paramount *566 Government rights. There is testimony by a railroad witness that values per acre of the three different categories of land respectively are in the ratio of 4:2:1. The Appeals Division assessed the entire 12.9 acres at $905,325, or $74,052 an acre for the northerly half and $67,518 for the southerly part.
The real estate experts for the municipalities argued that the company accepted a low price from the General Foods Corporation because it anticipated that the sale and the construction of a large plant on the premises would bring considerable traffic to the company. No facts proved support the thesis. But even though we surmise that the company did accept a price somewhat under "fair value," we cannot suppose a difference of more than $5,000 or $10,000 an acre. Also, we have no doubt that the value of the land in 1948 was greater than in 1938.
Three other transfers seem particularly pertinent to the value of the Eleventh Street property. The first of these was a transfer by the Lackawanna Railroad to the United States of 7.7 acres in Hoboken, known as the Fourteenth Street ferry property. This was a condemnation in which an appeal was taken from the award of the commissioners, but before it came to trial there was a settlement reached November, 1944, for $872,000. Mr. Mantell, for the municipalities, after allowing for structures, finds that the price amounted to $94,727 an acre. But Mr. Stewart, another municipal witness, figures the price at $61,520 an acre, while Mr. Goldstein, for the company, estimates the settlement at $32,234 an acre. In any event, this was not a transaction between willing parties, neither being under compulsion.
Close by the ferry property is a parcel of 18.7 acres that the Hoboken Land & Improvement Company conveyed to Bethlehem Steel Corporation in 1943, for a price of which the part allocated to land by Mr. Mantell equalled $45,365 per acre. Mr. Stewart puts it at $38,070, and Mr. Goldstein, at $29,185. This purchase was made at the Government's urging for ship-repair work. The same company acquired *567 an adjacent plot, 8.49 acres, in June, 1949, at a price that one of the company witnesses estimates at $49,800 an acre.
Making a reasonable allowance for the possibility that the railroad company may have sold to the General Foods Corporation at an especially low figure in order to get traffic, and making an allowance for increase in the value of land between 1938 or 1943, and January 1, 1948, still it is apparent that the assessment made by the Appeals Division  $74,052 and $67,518 per acre  finds no support in these sales. Nor is it supported by any other data in the cause. The assessment will be reduced to $66,650 an acre for the northerly part and $60,750 for the southerly, in accordance with the prayer of the railroad company, that is, to an assessment of $814,688 in all.
Jutting out from the northeast corner of the great terminal tract is a parcel of 10.3 acres, which is assessed separately from the terminal proper, though at the same rate per acre. It is the passenger ferry plot.
Mr. Fugazzi, an expert for Hoboken, testified to the sale of three piers located but a short distance north of the ferry lot. Webb & Knapp, in 1946, sold two of the piers to the Holland-American Line for $2,147,500. The structures Mr. Fugazzi estimated to be worth $850,000, and he applied the balance of the price to the land, 9.7 acres, mostly under water, at $138,956 an acre. The other transfer was the sale of a pier at Eighth Street by Webb & Knapp to Hansen & Co. in 1948 for $1,750,000. Here, Mr. Fugazzi valued the improvements at $800,000 and calculated the price of the land at $138,869 per acre. Mr. Wierdsma, the general manager of the Holland-American Line, testified to the purchase of the two piers. One of them, the Fifth Street pier, which had been the American passenger terminal of his line since 1910, was held by the company under lease from the Hoboken Land & Improvement Company. Three months before the lease expired in September, 1946, Wierdsma learned that Webb & Knapp had bought the property and would not renew the lease on terms that he considered practical; he could find *568 no other suitable property; he had to buy. But Webb & Knapp would not sell the Fifth Street pier except in conjunction with the Sixth Street pier, so he bought both piers. Mr. Johnson, who was associated with Hansen in buying the Eighth Street pier, testified in similar vein. The buyers had held under a lease containing a three-months' cancellation clause. Webb & Knapp gave notice of cancellation; the tenants could find no other property satisfactory to them, and so bought. Johnson said, "It was either purchase the pier or go out of business."
The three piers were bought under compulsion, and therefore the prices paid must be heavily discounted. Even so, we consider that they support the assessment of the ferry lot, made by the Appeals Division, $93,312 an acre, making $962,513 for the lot. The assessment will be affirmed on the appeals of the railroad company and of the City of Hoboken.
Now we reach the large terminal tract, and we will assume that the Lackawanna offers it for sale, a hypothetical sale, as suggested in United N.J., etc., Co. v. State Board, 100 N.J.L. 131, 135 (E. & A. 1924). To lend an atmosphere of plausibility to the assumption, let us imagine that the Lackawanna and the Erie Railroad Company, whose terminal abuts the Lackawanna terminal on the south, decide to operate joint or union terminal facilities; the Erie land proves to be ample for all their operations and the decision to sell the 170-acre Lackawanna tract follows. We think that the property, while still in use by the Lackawanna, is worth as much as could probably be obtained under the imaginary situation that we have just outlined.
The fitness of this unique property for railroad use might induce some railroad company to make a satisfactory offer for it, though it is by no means certain that this would happen. We may notice the fact that hundreds of miles of railroad track have been abandoned in the United States during the last few decades. In New Jersey there has been a steady, though small, decrease in mileage. Many forces, of *569 which the most important is the growth of motor transportation over highways provided and maintained at governmental expense, have combined to make railroading a much less profitable and stable enterprise than it was half a century ago. Several of our New Jersey railroads that once were known as anthracite roads have suffered from the great decline in the mining and carriage of anthracite coal. The proofs show not only that no railroad has acquired waterfront property in Hudson County since 1916, but that, on the contrary, there have been a considerable number of sales of railroad lands. Indeed, several hundred acres of such lands (mostly under water) have been abandoned by railroads because they were not needed for railroad purposes and were worth less than accumulated taxes.
In the effort to sell the terminal yard at the highest price attention would doubtless be given to the possibility of a sale to some industrial corporation that might need such a site for assembling, warehousing and distributing operations in the heart of the world's greatest market and at the centre of worldwide communications. Or, if no such purchaser should appear, the division of the property into five or ten separate parcels would be considered, for buyers could be found more readily for such parcels than for the whole tract as a unit. The search for buyers would be nationwide, and the price would not depend so much on land values in the immediate vicinity as it would on a comparison with prices asked for other sites in the metropolitan area, even a few miles away, and a balancing of their respective advantages. A few sales of more or less comparable properties have already been briefly discussed by us and we may mention a few more.
There were what the witnesses refer to as the Hill Brothers assemblage in 1939 at $14,470 an acre, and the Seatrain assemblage of 16.8 acres in 1943 and 1945 at an average price per acre of some $16,000. These properties lay on the waterfront at Edgewater. Then a transfer by the Erie Railroad to the United States, 18.5 acres, mostly under water, at Weehawken, near the Hoboken line. The property was commandeered *570 by the Government early in the war for ship-repair purposes, and settlement made with the railroad in May, 1946, for $700,000, at the rate of $37,112 an acre. Next requiring mention is a sale by Jersey City to the United States, November, 1941, 330 acres for $2,000,000, or $6,039 an acre, and at the same time a sale of 10 acres, adjoining, by the Lehigh Valley Railroad. The property was in the southerly part of Jersey City and consisted of 39 acres of upland, 41 acres partially filled, and 260 acres under water. Last, a sale by the City of Bayonne to the United States of 460 acres in 1944 for an average of $11,626 an acre. Upland and filled land totalled 171 acres, and land under water 289 acres.
In the supposed effort to dispose of the terminal of the Lackawanna much thought would be given to selling it for resale in small lots, since it is just south of the most valuable piers and the best business district in Hoboken. In reaching a price for the whole the promoters would envision at the waterfront piers for large ocean liners, and back of them banks and stores, hotels and apartment houses, warehouses, garages, gas stations. Obviously, the expense of carrying out such a program would be very high. Streets must be opened and paved, a sewer system and other utilities installed. On the other hand, the prices obtained, over a number of years, would unquestionably make an impressive sum. While property should be valued for taxation on the actual condition in which the owner holds it, United N.J., etc., Co. v. State Board, 101 N.J.L. 303 (Sup. Ct. 1925), its value in that condition is affected by what can be done with the property. However, the evidence taken in this case does not permit a valuation on the basis suggested. The proofs contain nothing as to the expense that would have to be incurred and little as to prices that might be obtained.
In our consideration of the ferry lot we mentioned the sale of piers to the Holland-American Line and Hansen & Company at well over $100,000 an acre. These sales (discounted because the buyers were not "willing") would be quite persuasive of the value of the waterfront of the Lackawanna *571 terminal if River Street were extended south and the property cut up. But these sales do not have much relevancy to the question of the value of the greater part of the terminal tract extending back, as it does, 2,785 feet from the pierhead line. To project the prices received on these sales to the whole tract would be like applying the front-foot value of land on Fifth Avenue to the frontage on the side streets and to the Sixth Avenue end of the block. More relevant to the value of the Lackawanna's back land was a sale to one Graunstein in 1945 of a city block of vacant land between the rear parts of the Lackawanna and the Erie terminals, 1.8 acres, at the rate of $30,000 an acre. But we cannot reach a determination in this piecemeal fashion, for none of the parties or witnesses proceeded in this manner and the record does not afford the data for a valuation built on such a basis.
Here we reach the point where I differ with my colleagues. But before stating my own views, I will set forth their conclusions, that is, the conclusions of the court. Since the beginning of World War II, and especially since we became a participant in December, 1941, there has been a steady shrinkage in the value of money. Everything, the price of which can be accurately determined, had much increased in cost by January 1, 1948. In the absence of compelling evidence, we are unwilling to overrule the Division of Tax Appeals and hold that the Lackawanna Terminal tract, contrary to the universal trend, decreased in value during that period; and we are unable to find from the proofs that the assessments for prior years, which were either accepted by the railroad without appeal or were upheld against attack, were much, if at all, in excess of true value. The sales of other lands referred to in the testimony are not persuasive evidence of the value of the terminal tract; the dissimilarities in location, size, percentage under water, and in other important particulars, are too great. Such are the conclusions of the majority of the court.
The upshot of the whole matter is this: On the appeal of the railroad company, Docket A 219-50, the assessment of *572 the Eleventh Street land is adjudged to be excessive, and is reduced to $814,688, while on the same appeal the assessment of the Hoboken section of the terminal tract, including the ferry lot, is affirmed. The railroad company's appeal No. A 220-50, relating to land in Jersey City, and the appeals of the municipalities, No. A 216-50 and No. A 217-50, are dismissed and the assessments thereby challenged are confirmed. The parties will severally bear their own costs.
Now let me state my dissent:
In coming to my conclusion I have given careful attention to the fitness of the Lackawanna Terminal land for railroad use, and to the advantages of its location, especially as compared with land in Edgewater or Bayonne or the Greenville section of Jersey City. I consider reasonable Mr. Stewart's figure of ten per cent for plottage and I agree with Mr. Mantell that the terminal increased 20 per cent in value during the decade preceding the valuation date. And yet I find nothing in the record to support the assessment of the terminal (exclusive of the ferry lot), and much evidence pointing to a lower value. Where I depart furthest from the Appeals Division and from my fellow judges is in the weight of the presumption of the accuracy of the assessment of the terminal in prior years. To my mind the effect of that presumption is destroyed by the evidence in the case. In my opinion the assessment should be reduced from $92,340 in Jersey City and $93,312 per acre in Hoboken to $83,100 per acre in both municipalities.